**FILED**

Xavier Lumar J'weish
Hwt 104 - p.o. box 409090
lone California [near 95646]
T-08643 . Fac E .19. bld . Cell 201
(Pro de Litigant)

JUN 06 2024

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
        DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA
SACRAMENTO DIV.

Xavier Lumar, J'weish,
              plaintiff,

                                  Case No.: 2:21-cv-00712-WBS-DB

                                  PLAINTIFF'S Motion For Rule 56.
                                  Summary Judgment

vs.

Joe Lizzarraga.(ex. Warden,
              respondent et al.,

PLAINTIFF'S Motion For Summary
Judgment To Respondents.et al.,

1. Plaintiff submits this Motion For Summary Judgment Rule 56 (c).
Because respondent's have failed to 1.) Factually Demonstrate how
immunity under the Elevnth Amendment in this subject matter
applies, to them.
Whereas cder's own policy California Department Of Corrections &
Rehabilitations Operations Manual 11010.6 & Cal Pen Code §43.
Title 7. Ch 2 § 99 . Penal Code (P.C.) §3352.
2. " THE SECRETARY Has Total Control Over All California State CDCR's
Operation's As Well As Each Institution Under It's Jurisdiction ".
Allowing THE SECRETARY To Have First Hand Knowledge Of All
Building Structures And Facilities. And further within

1.

Subchapter 5. PERSONNEL ARTICLE 1. Wardens, Superintendents. Parole Region Administrators.

3382. INCIDENT REPORTS.

(a) Any EVENT or ACTIVITY OCCURRING WITH THE JURISDICTION OF INSTITUTIONS or PAROLE REGIONS Which MAY BE IMMEDIATE **INTEREST** or CONCERNS) to the department, or a SPECIAL INTEREST To OTHER GOVERNMENTAL AGENCIES or THE NEWS MEDIA, WILL BE IMMEDIATELY REPORTED BY INSTITUTION AND REGION STAFF BY TELEPHONE TO THE OFFICE of THE SECRETARY or TO THE DEPARTMENTAL DUTY OFFICER. WARDENS & SUPERINTENDENTS WILL SUBMIT A WRITTEN REPORT OF THE INCIDENTS To THE SECRETARY WITHIN 24 hrs of THE VERBAL NOTICE.

These two (*2) subjects above that gives clear showing that it is policy by cock, and penal Code law, that states that the warden, respondant. Does have a professional primary liability under state and federal law.

To know everything of seriousness (such as DRINKING WATER CONTAMINATION) a violation of California's Clean Waters Act. [ i 3] Health 3 Safe Codes § 25249.5.)

Which Prohibition on Contaminating DRINKING WATER with Chemicals known to Cause Cancer or other seriousness of long term Health Reproductive Toxicity.

No person in the Course of doing business Shall knowingly discharge or release [a] / Any chemical known to the state to cause cancer or reproductive toxicity into water or onto land where

2.

such chemical passes or probably will pass into any source of
drinking water notwithstanding any other provision or
authorization of law. A violation of § 25249.9.

Respondents did have knowing knowledge and are in violation of
Deliberate Indifference for the deprivation of the following;
EIGHTH AMENDMENT CONSTITUTIONAL RIGHTS; INHUMANE LEVEL OF CARE
To SAFE CLEAN DRINKING WATER; WHICH RESULTS To CRUEL &
UNUSUAL LIVING CONDITIONS OF CONFINEMENT; Saf Code §25249.5.
Respondents violation are the deprivation of safe clean drinking water
as all are High level Officials employed by California Department
of Corrections & Rehabilitation (cdcr)   And who all have the
authorized power to fix this problem (e.g., warden's, Secretaries.)

This serious health problem violation of Cal Health & Saf Code §
25249.5 have been ongoing for decades. A long standing failure to
protect plaintiff, & the prison population that consist of CCCMS
Mental Health prisoners; (DDP) Developmental Disabled Person;
High Risk Medical; (ADA) American with Disability Act.
As mule creek state prison (mcsp) is a medical facility.


<u>OFFICIAL'S KNOWLEDGE OF THE SUBSTANTIAL HEALTH RISKS</u>.

1. These conditions were known then, as they are now. Plaintiff
has filed the proper filing along with supplied reports made to
those in charge, and responsible for my well being, safety of
health and living conditions. The reports do lay out a long
pattern of inhumane conditions to a basic need in which is

to show an official's knowledge of particular condition at your jail prison.

Below are Quote(s) of that of Officials for Mule Creek State Prison, Correctional Employees: There is a Computer Generated Memo for UC's - Staff Only, "For Your Eyes Only" informing them to Not Drink The Water: A Memos stating as Follows:

• Current CDCR staff has confirmed that many sewer pipes in the facility were Cast iron. With 30 years of corrosive sewage moving through the pipes it has corroded many pipes.

• Documented are statements made by a "Master Plumber" whom did an interview with the News Paper Dispatch Ledger, discussing the phases of the mule creek sewer pipes underneath the prison. Quoting "Confirming that there are Multiple Cross Connections of Sewage Pipes under the Prison."

• CDCR Mule Creek State Prison Put Out The Following " A Draft Memo also includes a Summary of Detected Waste Constituents in the drinking water System, they include: Voc's (Volatile Organic Compounds.) E. Coli (Escherichia Coli Bacteria) Coliform and Metals, High levels of Nitrates.

4.

<u>Violation Of Cal Health & Saf Code § 25249.5</u>

Prohibition on Contaminating drinking water with chemicals Known to cause cancer or reproductive toxicity.

No person in the course of doing business shall knowingly discharge or release a chemical known to the state to cause cancer or reproductive toxicity into water or onto land where such chemical passes or probably will pass into any source of drinking water notwithstanding any other provision or authorization of law except as provided in Section 25249.9.

• David Anderson, a Worker Supervisor for "Sierra Communication and Construction Incorporated (SCCI) Quoted "There is a massive failure of the 'sewer system underneath the prison facility. I have witnessed and documented."
This information was placed in the local newspaper. And it's never been contested as untrue. Posted in the Dispatch Ledger News Paper.

• Around December 15, 1994, The City of Ione, took order to court over the contamination occurring at mule creek state prison in which is the source of the plaintiff's injury health issues caused by the contamination. This information also inside the Dispatch Ledger

Defendant alledgely had chemicals, toxic chemicals poured into the boilers in which ate the lineing from the inside of them, to attempt to fix the contamination of air, plaintiff's drinking water. As the water from the boiler does go through the prison Kitchen, Cells, showers. Defendant authorization was to plant operation. Who authorized defendant to use those chemicals.

5.

Further raising violation of California Environmental Quality Act (CEQA). And the Court found in favor by the Court that in recards to the (1985) Original Mule Creek state prison (mcsp) Contract, and that Contract is still legal and valid in all respects and enforceable."

• In 2006 and 2007, the (RWQCB) The Regional Water Quality Control Board fined mule creek state prison $50.000 each time for it's contaminated water spewing over into the drinking wells, and neighboring wells, and other matters of land from the contamination, that have had catastrophic affect on the Environmental (EPA) standards by Federal & State.

   <u>ANDREW ALTEVOGT ASSISTANT EXECUTIVE OFFICER FOR THE (RWQCB)</u>
• ANDREW ALTEVOGT, an expert and an Assistant Executive Officer
   of the CENTRAL VALLEY REGIONAL WATER QUALITY CONTROL BOARD
   (RWQCB) quoted.
"BASED ON THE CALIFORNIA DEPARTMENT OF CORRECTION'S AND REHABILITATION (CDCR's) Tests over the past year and the Range of Constituents: Including Voc's (VOLATILE ORGANIC COMPOUND). E. Coli, ESCHERICHIA Coli BACTERIA,) CALIFORN AND METALS -WE CAN TELL You Somewhere Things Are GETTING INTO THE DRINKING WATER SYSTEM at Mule Creek State Prison (MCSP)."

   A drafted memo also includes a summary of the detected waste Constituents in the water system, they include: ONE DETECTION of GASOLINE (96 DETECTIONS of DIESEL): 93 DETECTIONS of OIL AND GREASE; Voc's (VOLATILE ORGANIC COMPOUNDS): CHLORoFORM (15 DETECTIONS), BROMODICHLOROMETHANE (1 DETECTION), ACETONE (14

1   DETECTIONS), METHYLETHYL KETONE (4 DETECTIONS, NAPHTHALENE

2   (2 DETECTIONS), BENZENE (2 DETECTIONS), TOLUENE (3 DETECTIONS),

3   ETHYLBENZENE (1 DETECTION), AND XYLENE (5 DETECTIONS); SVOCS

4   (SEMIVOLATILE ORGANIC COMPOUNDS): BENZOIC ACID (2 DETECTIONS);

5   COLIFORMS: TOTAL COLIFORM WHERE IN 305 OUT OF 305 SAMPLES (LESS

6   THAN 1.600 MPN), FECAL COLIFORM WERE IN 300 OUT OF **305** SAMPLES

7   E.Coli WAS IN 303 OF 305 SAMPLES; ELECTRICAL SUMPS HAD

8   DETECTIONS OF COLIFORMS, CHLOROFORM, AND FREON, SUMPS COLLECT

9   GROUNDWATER AND ARE PLUMBED TO THE WATER SYSTEM, CAFFIENE WAS

10   DETECTED IN THE WATER AS WELL

11

12   •   Further ANDREW ALTEVOGT quoted, "WE'VE BEEN FOLLOWING THE

13   SERIES OF ARTICLES IN THE LEDGER DISPATCH AND WE ARE VERY

14   CONCERNED WITH THE CONTAMINATION OCCURRING AT MULE CREEK

15   STATE PRISON COMING FROM AN UNDETERMINED SOURCE."

16

17   •   A later statement ANDREW ALTEVOGT quoted. "Somewhere

18   CONTAMINANTS ARE GETTING INTO THE DRINKING WATER SYSTEM UNDER

19   MCSP ITSELF. WHILE CDCR CONDUCTED TESTS. THEY HAVEN'T

20   DONE ENOUGH NOR HAVE THEY TAKEN A LOOK UNDER THE PRISON

21   ITSELF."

22

23

24

25

26   what are the long term side affects health wise from consuming

27   contaminated water with these type of constituents in it? THE AGENCY WQA HAS ALSO ESTABLISHED THAT THESE CHEMICALS CAN ALSO BE

28   ASSOCIATED WITH AFFECTING THE CENTRAL NERVOUS SYSTEM IN ADULTS. water Quality Association.

<div align="center">7.</div>

1 . Andrew Altevelt an Assistant Executive Officer of the Central
2 Valley Regional Water Quality Control Board (RWQCB).
3 "We've been following the series of Articles In The Ledger Dispatch
4 and we are very concerned with the Contaminated Water Coming from
5 an Undetermined Source.

6
7 . The Regional Water Quality Control Board (RWQCB) have Fined
8 Respondents Proven that the warden had total Control
9 over the prison. And the defintion of warden is a person
10 in charge.

11
12 . Cal. Sportfishing Prot. All v. Allison, 2023 U.S. Dist. LEXIS 5045
13 [in] Opinion by: William B. Shubb
14 I. Judicial Notice
15 A court may take judicial notice of facts "not subject to
16 reasonable dispute" because they are [*3] either "(1)
17 generally known within the territorial jurisdiction of the trial or
18 (2) capable of accurate and ready determination by resort to
19 sources whose accuracy cannot reasonably be questioned.
20 "Fed. R. Evid. 201.
21 Defendants and Amador request that the Court take judicial
22 notice of various documents from the Central Valley Regional
23 Water Quality Control Board, and the U.S. Environmental
24 Protection Agency: (see Docket Nos. 45-2; 97-3.) The Court will
25 take judicial notice of the materials. See Daniels-Hall v. Nat'l
26 Educ. Assn. 629 F.3d 992, 998-99 (9th Cir 2010) a court may
27 take judicial notice of "information [that] was made publicly
28 available by government entities." Where "neither party

8.

A.    THE LAW PROVIDES CLEARLY THAT THERE ARE SEVERAL
ADDITIONAL WAYS TO PROVE AN OFFICIAL'S KNOWLEDGE
OF A SUBSTANTIAL RISK OF SERIOUS HARM.
INMATE FILED 602 GRIEVANCES AND APPEALS ABOUT
THIS PROBLEM. THERE ARE LAWSUITS AND HAVE
BEEN LAWSUITS FILED ON THIS SUBJECT MATTER.

See. e.g., *Bradley v. Puckett*, 157 F. 3d 1022, 1026 (5th Cir. 1998)
(inmate "provided documentation regarding the numerous Complaints" he
made about unhygienic Conditions); *Brown v. Barceau*, 207 F. 3d 863, 865-
68 (6th Cir 2000) ("[W]e must assume - based on Brown's allegations
concerning his repeated attempts to notify prison officials about the
conditions in his Cell - that the warden knew about and deliberately
disregarded the risk to Brown's health and safety.");
officials are responsible for information that they learn during a lawsuit.
See *Farmer v. Brennan*, 511 U.S. at 846 n9 ("if ... the evidence
before a district Court establishes that an inmate faces an
objectively intolerable risk of serious injury, the defendants
could not plausibly persist in claiming lack of awareness ... ");

officials may have observed problems on their own and recorded
their observations in internal records, reports, or correspondence,
or in the minutes (meeting notes) of local government bodies.
*Bradley v. Puckett*, 157 F. 3d at 1026 ( prison records revealed
that inmates was not provided with regular bathing schedule for
two months.);

There may be stories in local newspaper about your facility,
sometimes with quotes by officials acknowledging the
problems you are challenging. All of these documents can help

9.

disputes the authenticity ... or the accuracy of the information"); Mack v. S.Bay Beer Distribs., Inc., 798 F.2d 1279, 1282 (9th Cir) Abrogated on other grounds Astoria Fed. Sav. & Loan Ass'n v. Solimino, 501 U.S. 104, 111 S.Ct. 2166. 115 L.Ed.2d 96 (1991) ("[A] Court may take judicial notice of records and reports of administrative bodies.'") (citation omitted).

## II. Legal Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any matter of law." Fed. R. Civ. P.56 (a). A party may move for summary judgment either for one or more claims or defenses, or for portions thereof. Id. Where a court grants summary judgment ["4"] only as to a portion of a claim or defense. it "may enter an order stating any material fact . . . that is not genuinely in dispute and treating the fact as established" in the case." Id. at 56 (g)

A material fact is one "that might affect the outcome of the governing law," and a genuine issue is one that could permit a reasonable trier of fact to enter a verdict in the non moving party's favor. Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 248, 106 S.Ct. 2505. 91 L.Ed.2d 232 (1986). The moving party bears the initial burden of establishing the absence of a genuine issue of material fact and may satisfy this burden by presenting evidence that negates an essential element of the non-moving party's case. See Celotex Corp. v Catrett, 477 U.S. 317. 322-23. 106 S.Ct 2548. 91 L.Ed.2d 265 (1986).

Officials are responsible for information that they learn during a lawsuit.
See *Farmer v. Brennan*, 511 U.S. at 846 n.9 ("If... the evidence
before a district court establishes that an inmate faces an objectively
intolerable risk of serious injury, the defendants could not plausibly
persist in claiming lack of awareness..."): *Harris v. Angelina
County*, 31 F.3d 331, 335 (**6th**. Cir 1994) ("evidence brought to the
attention of the County through this ongoing litigation itself"
helped to establish "officials' deliberate indifference):

Defendants have long to have been fully aware of this drinking
water Contamination in violation of *Cal Health & Safe Code* §
25249.5
*Guzman v. County of Monterey* 46 Cal 4th 887. (3) THE SAFE
DRINKING WATER Act: THE LEGISLATURE ENACTED THE SAFE DRINKING
WATER Act IN PART TO ENSURE THAT THE WATER DELIVERED BY
PUBLIC WATER SYSTEMS OF THIS STATE SHALL AT ALL TIMES BE
PURE, WHOLESOME AND POTABLE." Health & Safe Code § 116270
subd (e) legislative finding and declaration.
Cal Wat Code § 13850.


CALIFORNIA, STATE Officials Found Liable For DELIBERATE
INDIFFERENCE During 2020 COVID Outbreak

THE NINTH CIRCUIT Ruled CALIFORNIA Prison Officials Acted With DELIBERATE
INDIFFERENCE," by not taking sufficient precautions or countermeasures
during the 2020 Covid outbreak, reported the Courthouse News
Service.
The decision allows the State and San Quentin State Prison officials
to face liability for the Covid outbreak where 29 persons died

1   and infected over 2,000 San Quentin community members.

2       Former resident, Michael Hampton died during the outbreak. His
3   widow filed a lawsuit claiming prison officials exposed him to Covid,
4   violating her husband's Constitutional rights.

5       The three judge's ruling allows widowed Hampton's Eighth
6   Amendment claim to proceed. Mrs. Hampton, "adequately alleged
7   that defendants acted with deliberate indifference to the health and
8   safety of San Quentin inmates, including Hampton," said the
9   panel, according to the article.

10  The case was spurred by CDCR's transfer of 122 medical-high-
11  risk residents from California's Institution for Men in Chino.
12  The Chino transfers" became the catalyst for San Quentin's Covid
13  outbreak.

14     Most of the Chino transfers received no testing or screening for
15  Covid before boarding buses headed for San Quentin, said the
16  article.

17

18     The state's prison officials requested relief for qualified
19  immunity from liability by arguing for implementation of the
20  Public Readiness and Emergency Preparedness Act (PREP). The
21  act passed in 2005, providing qualified immunity to
22  vaccine manufactures during public health crises.

23

24

25  WHERE PRISON OFFICIALS WERE NOT INTITLED TO QUALIFIED IMMUNITY IN THE
26  ABOVE COVID CRISES OF 2020 UNDER THE LAW.
    How ARE THE DEFENDANTS APPOINTED REPRESENTITIVES CLAIMING IMMUNITY
27  ALLEGEING IS THAT THEY WERE NOT AWARE OF THE CATASTROPHIC
28  CONTAMINATION FOR A ISSUE THEY'VE BEEN GETTING MILLIONS FOR.

12.

In May, Senior U.S. District Judge William Orrick III denied the state's request for immunity. The Ninth Circuit panel affirmed Orrick's decision on October 3, 2023.

Judges Michelle Friedland, a Barack Obama appointee, Mark Bennett, a George W. Bush appointee opined. "We affirm the district court's conclusion ... officials are not entitled to immunity under federal law for the claimed violation ... and we lack jurisdiction to consider whether the officials are entitled to immunity under state law."

The panel said the PREP Act doesn't shield prison officials because they "failed to administer a 'covered counter measure,' such as vaccines, medication, devices, or other measures used to prevent, diagnose, or treat a public health emergency or a security threat."

The panel determined the issue concerns the right to freedom from exposure to a serious disease. The panel cited Helling v. McKinney, a 1993 decision by the U.S. Supreme Court.

In re: Helling, the Supreme Court ruled incarcerated possess rights to sue to prove Eighth Amendment violations if prison officials acted with deliberate indifference.

Judge Friedland stated. "All had been briefed on the dangers of Covid. [it's] highly transmissible nature ..., the necessity of ... taking precautions to prevent it spread.

1    B.    DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY.

2

3    Defendants argue that the doctrine of qualified immunity shields

4    them from liability for their decision to subject plaintiff to cruel

5    and inhumane conditions for violations of Cal Clean Water Act

6    at the Mule Creek State Prison.

7

8    The Supreme Court has explained, "qualified immunity seeks to

9    ensure that defendants reasonably can anticipate when their

10   conduct may give rise to liability, by attaching liability only

11   if '[t]he Contours of the right [violated and sufficiently clear that

12   right.'" United States v. Lanier, 520 U.S. 259.

13

14   Defendants can not claim Qualified Immunity, where they are

15   receiving funding for contamination of drinking water and

16   remediation.

17

18   · Defendants have been fined, sued & settled for the water

19   contamination that is occurring at the source Mule Creek

20   state prison. Yet defendants and representatives are

21   allegeding that plaintiff & prison population at a medical

22   institution are not being affected, at the same source of

23   the contamination.

24

25

26   Johnson v. Lewis, 217 F.3d 726

27   Eighth Amendment

28   [fn 3] [fn 4]

14.

Clean Water

Inmates may not be denied an adequate amount of clean drinking water.

Plaintiff has good reason to believe through evidence statements by those included that the Mule Creek prison's drinking water supply is contaminated, inwhich is why injective relief should be granted.

<u>Helling v. Mckinney</u>, 509 U.S. 25, 113 S. Ct 2475 (1993)

See also <u>Keenan v. Hall</u>, 83 F.3d 1083, 109 (9th Cir 1996)

Summary judgment


. Plaintiff further states that documentation b/ statements of Mule Creek Prison Correctional Officer's, & Master Plumber, whom have stated that there is a corroded pipping problem of the prisons sewage pipe, Cross Connections of these pipes, underneth the prison housing units.

The United State Court of Appeals for the Ninth Circuit, which determined that respondent would have to prove a subjective deliberate indifference on the part of the prison officials who had voluntarily exposed the inmate to an unreasonable risk to his health in violation of 42 U.S.C. §1983 and the Eighth Amendment while incarcerated within their prison.

15.

1  · These precedent preclude entry of Summary Judgement against
2     plaintiff on qualified immunity.

3

4     This case present the misconduct that is clear and so egregious
5     as various agencies The Regional Water Quality Control Board being
6     agency in charge of making sure that all companies, homes,
7     dwelling's also prison institutions. Are in compliance under Cal
8     Clean Water Act.

9

10  · The Serris Construction Company Inc's own Supervisor's also informed
11    defendant's of the catastrophic Sewage piping failure around the
12    time of 2012 - 2017 - 2019. Hired by the defendants. The Contamination
13    of drinking water.
14    And for that time span there has been this Catastrophic Contamination
15    under defendant(s) watch as there title were and are warden(s),
16    secretaries. The long neglect of maintenance up keep.
17    And it is plaintiff's strong belief that there are reciepts documents
18    that would be brought forward by way of discovery. How many
19    reciept. for how much was requested financially and for what water
20    fixture s of the sewage piping system repair have not been
21    done. And defendant(s) **hired** the Serris Construction.
22    And they then told defendants about the problems mentioned.
23    And that is documented.

24

25  · her whelming evidence in support of this drinking water contamination
26    as that evidence would also be within the attorney generals
27    position.

28

---

that more than that in which I've presented within my scope of not being appointed a Investigator to retrive financeing reporting documents to provide a showing as to why at a law finance of approximately $77 Million dollars.

This is a misappropriation of funds requested, allotted for fixture of the contaminated drinking water, shower water.

• Well contamination & water table contamination reports.

Because the water is still contaminated. And the water contamination through-out numerous prisons, & again where is all these millions that was suppose to have went to the water contamination. Mule Creek, Waaa, C.M., and numerous of others. A Crime of misappropriation of funding, continuing financial crime. Sect 225: $10,000,000 individual, $20,000,000 organization.

C. <u>PLANTIFF'S REQUEST FOR INJUNCTIVE RELIEF Is Not MOOT.</u>

Defendants, Attn General's Office, contend that plaintiffs request for injunctive relief is moot. With the numerous request for fixture of the above inclosed subject were a inhumane action is talking place. In serious violation of CORRODED SEWAGE PIPES underneath, severodl cross corroded pipes. And it's to my belief there is a building Health Saf Code Violation.

People Hired by the defendants have informed them of everything that plaintiff has obtained about the extreme infrastructure failure and there is so much more. that supports plaintiffs claims in which would be in possession of the Attorneyeeneral's Office.

or discovery.

de why would defendants be against fixing the sewage pipes that defendants them selves say exisit are busted corroded under the prison housing units.

Causing for a sewage dump to now have Accumulated. Another Serious Health Hazard. Estelle, 429 U.S. at 104-05.

So why would defendants contend that the injunctive relief is moot. When their are serious infrastructure failures of the piping sewage system underneth the prison.

The prison system have, and are allowing inhumane living conditions and this is by the housing actions of defendants.

To say that defendants do not know of issue's of this maznatud. And this is your counter argument. I ask what is your financial cut. Steve Wonder, can see this crime that is past and even settled. And you claim they have immunite, they new this problem exisit so how are they immune for this when they are still getting money for it.

I said it before, I'd been doing crime for so long I can spot criminal acts wheather your in a suit or jeans and hoodie.

And the A G's office Rob Bonta, have held press meetings seen on t.v. focused on Corrupt business committing Corrupt crimes. Yet your not going after CDCR why? What are you getting out of all these millions requested and not used on what it was asked for?

18.

Based on information & Belief that Discovery will prove & bare out the following facts:

· Before these action could be put into place that follows, the problem had to have been discovered and reported for a date to be the start date for the funds inwhich would have to be requested for the RunOff of THE Grounds Contamination, and in addition to broke watermains, cross Connection potable water pipes under mule creek state prisons property the housing units.

· As stated by David Anderson who is the Supervisor for The derra Communication And Construction Incorporated (SCCI) who was hired with those allotted funds by cdcr defendant.

· we know that the funds was requested and spent as required by the budget allocation process.
And for the request to be made the following had to be signed off on. And to spend those funds and go through bid process inorder to find a Contractor. And the following individuals had to sign off on the use of the funds.

· As a matter of Security the (ex) Warden defendants, chief deputy warden, the Custody Captain. Facility Captain of the yard, the L.t., and dgt of the yard, where the work Construction work will be performed at / on institutional grounds would be the reason the purpose heavy equipment is need . How many personal, and

A.

Or Free Staff in which all of those individuals would have to a vetted back ground check in order to be cleared to enter into the institution by the warden as to why they were here.

As there are various ways personal involvement can be shown One court has said that a § 1983 defendant can be held liable

1.) the defendant participated directly in the alleged Constitutional violation. 2.) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong. 3.) the defendant's were grossly negligent in supervising subordinates who committed the wrongful acts, or 4.) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

2. Indirect Participation A defendant may be held liable "if the defendant set in motion a series of events that she knew or reasonably should have known would cause a Constitutional violation, even if others actually performed the violation. Conner v. Reinhard, 847 F.2d 384, 397 (7th Cir 1988): Accord. Bruner v. Baker, 506 F.3d 1231, 1239-43 (11th Cir. 2006) (Warden could be held liable for beating of prisoner based on evidence

20.

he was placed on notice of a history of widespread abuse....

In our view the right approach is that a prisoner's letters may support liability if "the communication, in its content and manner of transmission, gave the prison official sufficient notice to alert him or her" to a violation of law. Vance v. Peters, 97 F.3d 987, 993 (7th Cir. 1996): see Colon v. Coughlin, 58 F.3d at 873 ("The contents of the letter are not specified: we do not know, therefore, whether the letter was one that reasonably should have prompted [defendants] to investigate").

The failure by defendants to perform a duty obligated as a CALIFORNIA STATE CORRECTIONAL PEACE OFFICER a duty imposed by statute or regulation may make a defendant liable even if she does not know about the particular constitutional violation that results. Johnson-El v. Schoemehl, 878 F. 2d 1043, 1049 (8th Cir. 1989) (liability may be based on "the breach of a legal duty that proximately causes

Plaintiff did forward a color 22 FORM REQUEST FOR INTERVIEW. at the time defendant (ex) warden JOE LIZZARRAGA if he drank the CONTAMINATED WATER HERE AT MCSP. Mule Creek Prison. As HE NOR did PATRICK COVELLO EVERY REPLY. Yet a tear EYES Only Computer ized MEMO was sent out to all C/o - Staff to not drink the water here. As well as visitors.

21.

1  the injury").

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27                                          22.

28

§113.14 Civil Action For Deprivation Of Rights : 42 U.S.C. 113.14

[1] Introduction

[a] Statute Provides Private Right of Action

Pursuant to 42 U.S.C. § 1983, every person who, under color of any statute, ordinance, regulation, custom, or usage of a state or territory or the District of Columbia, subjects, or causes to be subjected, a citizen of the United States or other person within the jurisdiction of the United States to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws is liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress [Roger v. County of Riverside, 44 Cal. App. 5th 510] CA (13)↑ 13

Monell v. Dep't of Soc. Servs., 436 U.S. 658

56[*690] 11

L Ed HN [1 E]

Headnotes

RIGHTS §12.5 > CORPORATIONS §2 > Violation of civil rights liability of local governments

[1E]

Local governments, municipal corporations, and school boards are "persons" subject to liability under 42 USCS 1983 for violating another person's federally protected rights, and thus are not wholly immune from suit under 1983 -- the statute covering legal as well as natural persons.

I reported a crime in 2017, of an inhumane act
of being forced to drink and bath in contaminated water
to the AG's office and the federal court. As this has
been going on for larger than a decades. But where
ar to whom all have received same of this monec? Some
Legislative funding, federal funding.

If you or the money obtained is followed it will show
another crime.

· Which brings to the matter that the Deputy Atty Ryan Gilles
actions in a case 5:18-cv-02488-AB-AGR Filed 11-23-or-25
of 2018. And not just subpoena at the Law Firm who
took that case also went to remove themselves
which would be on the record along with the judges reply
why would you remove yourself from a slam dunk case?
Harbed Hold informed me of this matter of Ryan Gille threating
that law firm. Along with tax evasion charges.
So in the matter of this case in which was also an
Contamination of water drinking water.
Acts by the Atty's office are of that of unclean hands.

24.

Our analysis of legislative history of the Civil Rights Act of 1871
Compels the conclusion that Congress did intend
municipalities and other local government units to be
included among those persons to whom § 1983 applies.

He H "Local governments, like every other § 1983 'person,'
by the very term of the statute, may be sued for constitutional
deprivations visited pursuant to governmental 'custom'
even though such a customs has not received formal approval
through the body's official decisionmaking channels."

## Vicarious Liability

Plaintiff's injury was caused by the conduct of another party-
Scott Kerwan, Kathleen Allison. Joe Lizarraga, Patrick Covello.
This doctrine known as respondeat superior ("let the superior
answer.") And under this doctrine an employer, is liable,
vicarious liability of an employer for actions committed by an
employee.
And it has long been settled, in addition, that employers are
vicariously liable even absent their own negligence, committed
by their employees "within the scope of employment."

As plaintiff's provides and have provided Material Facts showing
that defendants did have full knowing knowledge that the water
consumed was contaminated by EXPERT HIRED by defendant's
See pg 5.86.

25

1   This matter is quite simple. As it is apart of the Federal
2   Courts record as well as the Attorney Generals Offices, in
3   Civil litigation with cdcr's defendants. Enforcement News
4   California Water Board. Blair Robertson @ waterboards...ca.gov
5   provides in one case cdcr agreed to pay 2.5 Million
6   as a portion of that was to clean up the landscape.
7   from mule Creek prison out towards the neighboring cities.

9   And in between that landscape are the water tables, and water
10  wells that the prison population uses.

12  With the landscape contaminated also to violation Cal Clean Water
13  Act. The parties with a financial invested interest are
14  Committing a Criminal crime also.

16  Plaintiff further filed a Complaint about Peace Officers / Law
17  Enforcement Abelict against the attorney generals office
18  ale, and have continued to protect violations that are of
19  server INHUMANE BASIC HUMANE NEEDS of providing safe clean
20  drinking water. And a Constitutional violation.
21  As the awareness of such a dangerous health issue at
22  a Medical Facility. The Attorney General Office with unclean
23  hands as to mule creeks defendants Warden, and the
24  secretary as well as other California prison having
25  Contaminated drinking water problems for decades as
26  they've received as to my belief 100 Million if not more
27  stating that they need money to fix a serious
28  problem with Contaminated water that for decades is not.

Case 2:21-cv-00712-WBS-DB   Document 43   Filed 06/06/24   Page 27 of 92

fixed.

Financial Reports exist. as to this subject. And the fact that there are building health Safety Code violations due to the cast iron piping with a more than 30 year time span of harsh chemicals having corroded the pipes that now should be pvc piping, under all prisons, to prevent the further health violations.

Defendants and the Att. Gen. off, claims immunity alleging No ONE NEW. THE DEFENDANTS. The Att Gen off. He claims before the Court. The responsibility of the defendants as it is apart of there job didn't know that something of such a magnitude was occurring.

So what your saying that plaintiff is stupid unintelligent as well as every other inmate as to us being given contaminated drinking water. and not knowing?

<u>VOLATILE ORGANIC Compounds' HEALTH EFFECTS</u>
Health effects of volatile organic Compounds (VOCs). VOCs include a variety of chemicals, some of which may have short - and long term adverse health effects. see attached Exhibit [ ]

<u>E. Coli (Escherichia Coli) HEALTH EFFECTS</u>
Health Effects severe stomach cramps. diarrhea often bloody stool.

27.

<u>Tox FO's ™ For Chloroform</u>

See Attached; and what the effects are to my health, do to chlorsform.

CDCR in there own Memo/Reports stated and quoted that these same Constituents are within his drinking water.

Conclusion

For all of the above reasons plaintiff's motion for summary judgment should be granted.

5/12/23, 2024

Sincerely

Xavier Lung    J. Weir

29.

## CERTFICATE OF SERVICE

Case name: J Weid v Lizzzzzzn.

Case No.: 2:21-cv-00712 -WBS-DB

I am over 18 years of age and not a party to the above
titled action.

On _May_ , 2024 , I served a copy of _Summary Judgment, Exhibits[A]-_

_[ ] complaint upon law Enforcement/Peace Officers_ , on the below named persons
at the addresses shown by enclosing said document in an envelope
addressed to the persons with postage fuly paid and depositing
said envelope in the Mule Creek State Prison Mailbox.

I declare under the laws of the State of California that
the foregoing is true and correct.

Dated: _May_ . 2024.

Merrick Garland
U.S. Dept of Justice
950 Pennsylvania Ave NW
Washington D.C. 20530

U.S. EPA. OECA Integration
Targeting and Access Branch
MC 2222 A
1200 Pennsylvania Ave. NW Washington. D.C.
20460

# PROOF OF SERVICE BY MAIL

## BY PERSON IN STATE CUSTODY

(Fed. R. Civ. P. 5; 28 U.S.C. § 1746)

I, _Xavier Kumar Jweidi_ , declare:

I am over 18 years of age and a party to this action. I am a resident of _Mule Creek Lone City_

_____ Prison,

in the county of _Amador_ ,

State of California. My prison address is: _4001 Hwy 104 : P.O.Box 409540_ ,

_____.

On _5 .3. 2024_ ,
_____
(DATE)

I served the attached: _SUMMARY JUDGMENT & EXHIBITS [A] - [D] 1.2.3. APPEAL_
_EXHAUSTION: California FREEDOM of Information Act: Records of Volatile Organic_
_Compounds)(Fish)(Wildlife)(Molecules)(Enforcement News)_
(DESCRIBE DOCUMENT)

on the parties herein by placing true and correct copies thereof, enclosed in a sealed envelope, with postage

thereon fully paid, in the United States Mail in a deposit box so provided at the above-named correctional

institution in which I am presently confined. The envelope was addressed as follows:

I declare under penalty of perjury under the laws of the United States of America that the foregoing

is true and correct.

Executed on _5 . 2024_
_____
(DATE)

_____
(DECLARANT'S SIGNATURE)

Civ-69 (Rev. 9/97)

::ODMA\PCDOCS\WORDPERFECT\22832\1

# EXHIBIT COVER PAGE

EXHIBIT

*A*

❖ <u>Description of this Exhibit</u>:

FIRST LEVEL CDCR FORMS ON EXHAUSTED APPEAL 7.23.20

SECOND LEVEL APPEAL MAY 26.20

THIRD LEVEL APPEAL August 27.2021.

Log # MCSP-20-01787

❖ <u>Number of pages in this Exhibit</u>: #3 total pages.

❖ <u>JURISDICTION</u>: (Check only One)

- ☐ U.S. Supreme Court
- ☐ U.S. Court of Appeals
- ☑ United States District Court
- ☐ CA State Supreme Court
- ☐ CA Appellate Courts
- ☐ Superior Court
- ☐ Municipal Court
- ☐ County Grand Jury

State of California
CDC FORM 695
Screening For:
CDC 602 Inmate/Parolee Appeals
CDC 1824 Reasonable Modification or Accommodation Request

RE: Screening at the FIRST Level

*Thursday, April 23, 2020*

*J-WEIAL, T08643*
*A  001 2230001L*

LIVING CONDITIONS, Plumbing, 04/21/2020
Log Number: MCSP-A-20-01787
**(Note: Log numbers are assigned to all appeals for tracking purposes. Your appeal is
subject to cancellation for failure to correct noted deficiencies.)**

The enclosed documents are being returned to you for the following reasons:

***Your appeal has been rejected pursuant to the California Code of Regulations, Title 15,
Section (CCR) 3084.6(b)(6). Your appeal makes a general allegation, but fails to state facts or
specify an act or decision consistent with the allegation.***

| | |
|---|---|
| ☐ | M. Johnston, CCII Appeals Coordinator |
| ☐ | D. Pasioles, Lieutenant |
| X | W. Thomson, OT |
| ☐ | H. Fletes, CCII Appeals Coordinator (A) |
| ☐ | J. Lefsaker, AGPA (a) |
| ☐ | C. White, AGPA |
| ☐ | T. Meza, AGPA |

Appeals Coordinator
MCSP

**NOTE:** If you are required to respond/explain to this CDCR Form 695, use only the lines provided below.

*I will REITERATE THAT IT WAS BROUGHT TO MY ATTENTION THAT THE SIGN
EXISTS. You REJECTED MY APPEAL BECAUSE You DID NOT READ MY APPEAL
PROPERLY. I NEVER SAID THAT I HAD A SIGN, IT WAS BROUGHT TO MY ATTENTION
THAT IT EXISTS. PLEASE PROCESS MY APPEAL?*

Be advised that you cannot appeal a rejected appeal, but should take the corrective action necessary and
resubmit the appeal within the timeframes specified in CCR 3084.6(a) and CCR 3084.8(b). Pursuant to
CCR 3084.6(e), once an appeal has been cancelled, that appeal may not be resubmitted. However, a
separate appeal can be filed on the cancellation decision. The original appeal may only be resubmitted if
the appeal on the cancellation is granted.
**NOTE THIS CDCR 695 IS A PERMANENT APPEAL ATTACHMENT AND IS NOT TO BE REMOVED**

State of California                                    Department of Corrections and Rehabilitation

# Memorandum

Date:     May 26, 2020

To:       INMATE J-WEIAL, T08643
          Mule Creek State Prison

Subject:  **SECOND LEVEL APPEAL RESPONSE**
          LOG NO.: MCSP-A-20-01787

**ISSUE:** The appellant is submitting this appeal relative to living conditions. The Appellant stated, "that Mule Creek State Prison and CDCR has knowingly neglected to fix the issue of the contaminated water here at MCSP. Leaving Plaintiff to suffer an injury by being forced to drink contaminated water along with bathing in it.".....

**INTERVIEWED BY:** Dan Bowers Supervisor of Building Trades

**REGULATIONS:** The rules governing this issue are:

| CCR 3001 | Subject to Regulations |
|----------|------------------------|
| CCR 3084.1 | Right to Appeal |

A review of the Strategic Offender Management System listed the inmate does not require reasonable accommodations for the purpose of effective communication.

On May 26, 2020 D. Bowers, Supervisor of Building Trades, conducted a face-to-face interview with the appellant on the day room of building 1, regarding the submitted CDCR 602 Form Inmate/Parolee Appeal. The appellant did not provide any additional information. It was explained to the appellant, that there is nothing wrong with the drinking water here and that the contaminated water that he has been hearing about is not related to the domestic drinking water supply. He was also informed that our domestic water supply is tested regularly by Amador Water Association to meet all standards of domestic water supply.

**DECISION:** The appeal is denied.

The appellant is advised that this issue may be submitted for the next Level of Review, if desired.

Patrick Covello
Warden (A)
Mule Creek State Prison

STATE OF CALIFORNIA — DEPARTMENT OF CORRECTIONS AND REHABILITATION        GAVIN NEWSOM, GOVERNOR

**OFFICE OF APPEALS**
P.O. Box 942883
Sacramento, CA 94283-0001



OFFICE OF APPEALS
THIRD LEVEL DECISION

Date: August 27, 2021

NAME: Xavier J-Weial
CDCR #: T08643
INSTITUTION: MCSP
TLR: 2009293

The California Department of Corrections and Rehabilitation, Office of Appeals, received your Form 602 appeal of Log No. MCSP-20-01787 for the purpose of providing a Third Level Response to your claim or claims. Upon review of the Second Level Response previously issued to you and the written record in this case, the Office of Appeals has determined that the Second Level Response to your claim or claims shall serve as the Department's final decision. Your administrative remedies have been exhausted for this appeal issue.

This action by the Office of Appeals does not excuse you from exhausting any other administrative remedies that may be required or available to you in relation to your particular claim, including, but not limited to, the Department of General Services Government Claims Program, the Department of Fair Employment and Housing, or the Equal Employment Opportunity Commission.

Office of Appeals
California Department of Corrections & Rehabilitation

cc:    MCSP Grievance Coordinator

# EXHIBIT COVER PAGE

EXHIBIT

*2*

❖ Description of this Exhibit:

*CDCR 1432 Request for Inmate Public Records  Defendants Refused to provide*

❖ Number of pages in this Exhibit: __1__ total pages.

❖ JURISDICTION: (Check only One)

| | |
|---|---|
| ☐ | U.S. Supreme Court |
| ☐ | U.S. Court of Appeals |
| ☑ | United States District Court |
| ☐ | CA State Supreme Court |
| ☐ | CA Appellate Courts |
| ☐ | Superior Court |
| ☐ | Municipal Court |
| ☐ | County Grand Jury |

STATE OF CALIFORNIA                                                                DEPARTMENT OF CORRECTIONS AND REHABILITATION
REQUEST TO INSPECT PUBLIC RECORDS
CDCR 1432 (Rev. 09/07)

I request to inspect, in accordance with California Government Code (CGC) Section 6253 and the Guidelines for the Inspection of Public Records (CDCR form 1431), established by the California Department of Corrections and Rehabilitation (CDCR), records of the following name or type, maintained at the below CDCR location.

| NAME OF RECORD(S) OR DESCRIPTION OF SUBJECT MATTER: | | |
|---|---|---|
| _REF: APPEAL LOG NUMBER MCSP. B -19-00 445_ | | |
| _MITCHELL - A 70758 / B9 -009 - 1121001L_ | | |
| _MAY of 2020_ | | |
| _WATER CONTAMINATION / WATER CONDITION_ | | |

| FACILITY OR OFFICE WHERE THE RECORD IS MAINTAINED: |
|---|
| _Mule Creek APPEALS OFFICE OR 3rd OFFICE of APPEALS._ |

**Please mark the appropriate box**

☐ I do not desire to have a copy of the above record reproduced for my use.

☑ Reproduce a complete copy of the above named record for my use. I agree to pay postage and 12 cents for each page photocopied.

| REQUESTOR'S NAME (PRINT): | REQUESTOR'S SIGNATURE | DATE |
|---|---|---|
| _Xavier Lumar Steward_ | _Xavier Lumar Steward_ | _JAN 31 /2022_ |
| **REQUESTOR'S ADDRESS:** | | |
| ADDRESS | CITY, STATE | ZIP CODE |
| _4001 Hwy 104 - P.O.B. 76070_ | _Ione California_ | _95640_ |
| **REQUESTOR'S PHONE NUMBER:** | | |
| _N.A._ | | |

| FOR DEPARTMENTAL USE ONLY |
|---|
| Mark the appropriate box(es) and complete the related section(s). |

☐ An appointment has been made for the requestor to inspect the requested record(s).

Date [      ]   Time [      ]   Location _____

Signature of PRA Coordinator Authorizing Inspection _____   Date [      ]

☐ The requestor has inspected the requested record(s).

Inspection Date [      ]   Signature of PRA Coordinator authorizing the inspection _____

☐ The requestor has requested copies of the above named record(s).
Number of pages copied [      ]   Total Cost [      ]   Payment Method _____

☐ The requested record(s) is/are not considered a public record and will not be disclosed to the requestor. The requestor has been informed in writing of this decision and that the requestor may appeal this decision.

Signature of PRA Coordinator denying disclosure _____   Date [      ]

☐ The extent of the inspection requested or the reproduction services required, exceeds the service that can be provided at this location. The request has been referred to the appropriate Division/Office, for further consideration.

Signature of PRA Coordinator making the referral _____   Date [      ]

Pursuant to CGC Section 6253(c), an extension is needed to collect and review the requested record(s).

Reason: _____

Anticipated date of determination (Not to exceed 14 days beyond the original 10 authorized days). [      ]

Signature of PRA Coordinator Authorizing Extension _____   Date [      ]

# EXHIBIT COVER PAGE

EXHIBIT

C

❖ <u>Description of this Exhibit</u>:

_California Freedom of Information Act. The Sonoma_
_Superior Court Denied_

❖ <u>Number of pages in this Exhibit</u>: __5__ total pages.

❖ <u>JURISDICTION</u>: (Check only One)

- [ ] U.S. Supreme Court
- [ ] U.S. Court of Appeals
- [✓] United States District Court
- [ ] CA State Supreme Court
- [ ] CA Appellate Courts
- [ ] Superior Court
- [ ] Municipal Court
- [ ] County Grand Jury

# CALIFORNIA FREEDOM OF INFORMATION ACT
## FORMAL[1] / UNILATERAL[2] REQUEST FOR
## MATERIAL[3] EVIDENCE AND INFORMATION
## WITH
## GOOD FAITH EXCEPTION TO THE EXCLUSIONARY
## RULE FOR PRIVACY WHEN UNMASKING VERITABLE
## CASES OF ACTUAL INNOCENCE

*Xavier Lumar Jweid*

*4601 Hml 14 - P.S.Box 46766*

*Mule Creek S.P. Ione Cali. 95646*

*T68643 - 2b -8-236*

Date: *1 / 31 / 2022*

*Amador Court Superior Court*

*500 Argonaut Lane. Jackson, Cali.*

*95642*

*To Whom it May Concern:*

---

[1] Written request made binding by observance of required formalities regardless of the giving of consideration or recognizance
[2] Formally written request for public or amendatory non-public information in which only the party or agency the request is sent to is
obligated to perform and/or provide the act(s) therein being requested
[3] Evidence that warrants reopening of a claim or reversal of a conviction because but for the circumstances that the evidence was

RECEIVED
AMADOR SUPERIOR COURT

FEB - 3 2022

CLERK OF THE SUPERIOR COURT
BY _____

Dear _Superior Court of Amador_

As an indigent California state prisoner acting under and pursuant to the California Public Records Act section 6250 et seq.,[4] and thus having no ability myself to pay any compulsory fees or costs for searching, copying, or return sending of the requisite reports, articles, photos, or other case-related evidentiary documents described herein, I am formally and unilaterally requesting to obtain copies of:

1. THE COURT CASE DISMISSED AGAINST JASON SCHNAUS V. AMADOR. around approx time line year (2018)(2019). Concerning THE MATTER of A STOLEN TABLET COMPUTER.

2. THE CONTRACT WITH CDCR, Acting Through THE STATE OF CALIFORNIA with Amador County, the Amador County Unified School District and the City of Ione On September 9, 1985, which would be a Copy in full of the Original Agreement.

3. THE Documents of THE $50,000 by the Regional Water Quality Control Board Fine Against Mule Creek State Prison around the approximate time line of (2007)(2008). And Also those Documents of THE $50,000 Fine of 2006.

4. THE FEDERAL & STATE E.P.A. Guideline Standard That THE Source Molecular Company out of Miami Florida Go By Documents. According to California's E.P.A. Documented Guideline For Testing Water Samples.

---

[4] Public records are subject to inspection, examination, and copying by any member of the public and by statute offer exception to the privacy rule and an exemption from the attorney/client privilege that allows, and in certain circumstances requires, full disclosure of information as in post-conviction appeals involving defendants veritably claiming actual innocence that would otherwise be deemed confidential. This exception and exemption thus allow for admission into evidence of any and all records, reports, statements, or data compilations made by public or non-public offices or agencies that set forth activities of the subject office or agency, matters observed pursuant to a duty under law that are required to be reported, or factual findings resulting from an investigation previously conducted pursuant to lawful authority that are required by discovery rules and procedural law to be used in civil actions or proceedings in criminal actions against the government or any civilian conspirators acting therewith

(Details of copies being requested continued):

(Continued):

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

If there are fees involved with processing this Freedom of Information Act request in addition to sending the above described public, nonpublic, or ordinarily confidential records being sought, please inform me if a declaration of indigence beyond the one already stated above is required.

This information is not being sought for commercial purposes.

The California Public Records Act requires a response within ten business days. If access to the records or documents I am herein requesting will take longer, please contact me with information about when I might anticipate copies of what is being requested to be sent.

If you fail to comply with or feel disposed to deny any or all of this Formal / Unilateral request for material evidence and information congruent to the California Freedom of Information Act, which readily yields to the amendatory privacy endorsement, please cite each specific exemption you feel justifies your noncompliance or refusal to release the requested information and notify me of the appeal procedures available to me under the law.

Thank you for you anticipated observance to this Freedom of Information Act immersed parties and public agencies request.

Sincerely,

*(handwritten signature)*

Klaus Kumar J. Musil

Hsol Hul Flot - P.o.B.

40 90 40 - Mule Creek State

Prisan B-8-236

Ione California 95640

Copy - Files
      - State Attorney General
      - State Public Defender

# EXHIBIT COVER PAGE

EXHIBIT

D

❖ Description of this Exhibit:

REPORTS ON A FEW CONSTITUENTS FOUND IN THE WATER AT ARCSP.
AND THERE HEALTH RISK (VolaTiLE ORGANIC CompOUNDs *5 pg.)
(E.Coli. EscHeRicHiA Coli *2 pg) (ToxFAQ s™ For CHLOROFORM
*1 pg)(MolecuLes *3 pg) (ENForceMENT NEWS *9 pg)

❖ Number of pages in this Exhibit: _20_ total pages.

❖ JURISDICTION: (Check only One)

- [ ] U.S. Supreme Court
- [ ] U.S. Court of Appeals
- [✓] United States District Court
- [ ] CA State Supreme Court
- [ ] CA Appellate Courts
- [ ] Superior Court
- [ ] Municipal Court
- [ ] County Grand Jury

🇺🇸 An official website of the United States government

🔍        MENU

**Indoor Air Quality (IAQ)**

CONTACT US <https://epa.gov/indoor-air-quality-iaq/forms/contact-us-about-indoor-air-quality>

# Volatile Organic Compounds' Impact on Indoor Air Quality

**On this page:**

- Introduction
- Sources
- Health Effects
- Levels in Homes
- Steps to Reduce Exposure
- Standards or Guidelines
- Additional Resources

---

# Introduction

Volatile organic compounds (VOCs) are emitted as gases from certain solids or liquids. VOCs include a variety of chemicals, some of which may have short- and long-term adverse health effects. Concentrations of many VOCs are consistently higher indoors (up to ten times higher) than outdoors. VOCs are emitted by a wide array of products numbering in the thousands.

Organic chemicals are widely used as ingredients in household products. Paints, varnishes and wax all contain organic solvents, as do many cleaning, disinfecting, cosmetic, degreasing and hobby products. Fuels are made up of organic chemicals. All of these

products can release organic compounds while you are using them, and, to some degree, when they are stored.

EPA's Office of Research and Development's "Total Exposure Assessment Methodology (TEAM) Study" (Volumes I through IV, completed in 1985) found levels of about a dozen common organic pollutants to be 2 to 5 times higher inside homes than outside, regardless of whether the homes were located in rural or highly industrial areas. TEAM studies indicated that while people are using products containing organic chemicals, they can expose themselves and others to very high pollutant levels, and elevated concentrations can persist in the air long after the activity is completed.

# Sources of VOCs

Household products, including:

- paints, paint strippers and other solvents
- wood preservatives
- aerosol sprays
- cleansers and disinfectants
- moth repellents and air fresheners
- stored fuels and automotive products
- hobby supplies
- dry-cleaned clothing
- pesticide

Other products, including:

- building materials and furnishings
- office equipment such as copiers and printers, correction fluids and carbonless copy paper
- graphics and craft materials including glues and adhesives, permanent markers and photographic solutions.

# Health Effects

Health effects may include:

- Eye, nose and throat irritation
- Headaches, loss of coordination and nausea
- Damage to liver, kidney and central nervous system
- Some organics can cause cancer in animals, some are suspected or known to cause cancer in humans.

Key signs or symptoms associated with exposure to VOCs include:

- conjunctival irritation
- nose and throat discomfort
- headache
- allergic skin reaction
- dyspnea
- declines in serum cholinesterase levels
- nausea
- emesis
- epistaxis
- fatigue
- dizziness

The ability of organic chemicals to cause health effects varies greatly from those that are highly toxic, to those with no known health effect.

As with other pollutants, the extent and nature of the health effect will depend on many factors including level of exposure and length of time exposed. Among the immediate symptoms that some people have experienced soon after exposure to some organics include:

- Eye and respiratory tract irritation
- headaches
- dizziness
- visual disorders and memory impairment

At present, not much is known about what health effects occur from the levels of organics usually found in homes.

- EPA's Office of Drinking Water Regulations
  - List of Contaminants and their MCLs: Organic Chemicals <https://epa.gov/ground-water-and-drinking-water/national-primary-drinking-water-regulations#organic>
- U.S. Geology Survey's National Water-Quality Assessment (NAWQA) Program [Z] <https://www.usgs.gov/mission-areas/water-resources/science/volatile-organic-compounds-vocs>
  - Information on VOCs in Water Sources

# Levels in Homes

Studies have found that levels of several organics average 2 to 5 times higher indoors than outdoors. During and for several hours immediately after certain activities, such as paint stripping, levels may be 1,000 times background outdoor levels.

# Steps to Reduce Exposure

- Increase ventilation when using products that emit VOCs.
- Meet or exceed any label precautions.
- Do not store opened containers of unused paints and similar materials within the school.
- Formaldehyde, one of the best known VOCs, is one of the few indoor air pollutants that can be readily measured.
  - Identify, and if possible, remove the source.
  - If not possible to remove, reduce exposure by using a sealant on all exposed surfaces of paneling and other furnishings.
- Use integrated pest management techniques to reduce the need for pesticides.
- Use household products according to manufacturer's directions.
- Make sure you provide plenty of fresh air when using these products.
- Throw away unused or little-used containers safely; buy in quantities that you will use soon.
- Keep out of reach of children and pets.

- Never mix household care products unless directed on the label.

### *Follow label instructions carefully.*

Potentially hazardous products often have warnings aimed at reducing exposure of the user. For example, if a label says to use the product in a well-ventilated area, go outdoors or in areas equipped with an exhaust fan to use it. Otherwise, open up windows to provide the maximum amount of outdoor air possible.

### *Throw away partially full containers of old or unneeded chemicals safely.*

Because gases can leak even from closed containers, this single step could help lower concentrations of organic chemicals in your home. (Be sure that materials you decide to keep are stored not only in a well-ventilated area but are also safely out of reach of children.) Do not simply toss these unwanted products in the garbage can. Find out if your local government or any organization in your community sponsors special days for the collection of toxic household wastes. If such days are available, use them to dispose of the unwanted containers safely. If no such collection days are available, think about organizing one.

### *Buy limited quantities.*

If you use products only occasionally or seasonally, such as paints, paint strippers and kerosene for space heaters or gasoline for lawn mowers, buy only as much as you will use right away.

### *Keep exposure to emissions from products containing methylene chloride to a minimum.*

Consumer products that contain methylene chloride include paint strippers, adhesive removers and aerosol spray paints. Methylene chloride is known to cause cancer in animals. Also, methylene chloride is converted to carbon monoxide in the body and can cause symptoms associated with exposure to carbon monoxide. Carefully read the labels containing health hazard information and cautions on the proper use of these products. Use products that contain methylene chloride outdoors when possible; use indoors only if the area is well ventilated.

### *Keep exposure to benzene to a minimum.*

Benzene is a known human carcinogen. The main indoor sources of this chemical are:

- environmental tobacco smoke

- stored fuels
- paint supplies
- automobile emissions in attached garages

Actions that will reduce benzene exposure include:

- eliminating smoking within the home
- providing for maximum ventilation during painting
- discarding paint supplies and special fuels that will not be used immediately

***Keep exposure to perchloroethylene emissions from newly dry-cleaned materials to a minimum.***

Perchloroethylene is the chemical most widely used in dry cleaning. In laboratory studies, it has been shown to cause cancer in animals. Recent studies indicate that people breathe low levels of this chemical both in homes where dry-cleaned goods are stored and as they wear dry-cleaned clothing. Dry cleaners recapture the perchloroethylene during the dry-cleaning process so they can save money by re-using it, and they remove more of the chemical during the pressing and finishing processes. Some dry cleaners, however, do not remove as much perchloroethylene as possible all of the time.

Taking steps to minimize your exposure to this chemical is prudent.

- If dry-cleaned goods have a strong chemical odor when you pick them up, do not accept them until they have been properly dried.
- If goods with a chemical odor are returned to you on subsequent visits, try a different dry cleaner.

---

# Standards or Guidelines

No federally enforceable standards have been set for VOCs in non-industrial settings. To learn more about VOC's, including current guidelines or recommendations set by various organizations for formaldehyde concentrations, visit Lawrence Berkeley National Laboratory's Indoor Air Quality Scientific Findings Resource Bank ☑ <https://iaqscience.lbl.gov/>.

---

# Additional Resources

- ASHRAE: Indoor Air Quality Guide ☑ <https://www.ashrae.org/resources--publications/bookstore/indoor-air-quality-guide>, Strategies 5.1 and 5.2

- ASHRAE Standard 189.1-2014 ☑ <https://www.ashrae.org/resources--publications/bookstore/standard-189-1>, Sections 10.3.1.4 and 10.3.1.4 (b) 1

- California Department of Public Health: Standard Method for the Testing and Evaluation of Volatile Organic Chemical Emissions from Indoor Sources Using Environmental Chambers (Emission Testing Method for California Specification 01350) ☑ <https://www.cdph.ca.gov/programs/ccdphp/deodc/ehlb/iaq/cdph%20document%20library/cdph-iaq_standardmethod_v1_2_2017_ada.pdf>

- California Title 17 ATCM to Reduce Formaldehyde Emissions from Composite Wood Products ☑ <https://www.arb.ca.gov/regact/2007/compwood07/fro-final.pdf>

- Carpet and Rug Institute: Green Label Plus ☑ <https://carpet-rug.org/testing/green-label-plus/>

- Collaborative for High Performance Schools: High Performance Products Database

- EPA: Formaldehyde Standards for Composite Wood Products <https://epa.gov/formaldehyde/formaldehyde-emission-standards-composite-wood-products>

- Indoor Air Fact Sheet No. 4 (revised) - Sick Building Syndrome <https://epa.gov/sites/default/files/2014-08/documents/sick_building_factsheet.pdf>

  o Explains the term "sick building syndrome" (SBS) and "building related illness" (BRI). Discusses causes of sick building syndrome, describes building investigation procedures and provides general solutions for resolving the syndrome.

- Indoor Air Pollution: An Introduction for Health Professionals <https://epa.gov/indoor-air-quality-iaq/indoor-air-pollution-introduction-health-professionals-printable-version>

  - Assists health professionals (especially the primary care physician) in diagnosis of patient symptoms that could be related to an indoor air pollution problem. Addresses the health problems that may be caused by contaminants encountered daily in the home and office. Organized according to pollutant or pollutant groups such as environmental tobacco smoke, VOCs, biological pollutants and sick building syndrome, this booklet lists key signs and symptoms from exposure to these pollutants, provides a diagnostic checklist and quick reference summary, and includes suggestions for remedial action. Also includes references for information contained in each section. This booklet was coauthored with the American Lung Association, the American Medical Association and the U.S. Consumer Product Safety Commission.

Indoor Air Quality Home <https://epa.gov/indoor-air-quality-iaq>

Learn about Indoor Air Quality <https://epa.gov/indoor-air-quality-iaq/learn-about-indoor-air-quality>

IAQ by Building Type <https://epa.gov/indoor-air-quality-iaq/indoor-air-quality-building-type>

Network and Collaborate <https://epa.gov/indoor-air-quality-iaq/network-and-collaborate-about-indoor-air-quality>

Popular IAQ Topics <https://epa.gov/indoor-air-quality-iaq/popular-indoor-air-quality-topics>

Frequently Asked Questions <https://epa.gov/indoor-air-quality-iaq/indoor-air-quality-iaq-frequently-asked-questions>

Publications <https://epa.gov/indoor-air-quality-iaq/publications-about-indoor-air-quality>

Regional and State IAQ Information <https://epa.gov/indoor-air-quality-iaq/epa-regional-office-and-state-indoor-air-quality-information>

Webinars, Meetings & Updates <https://epa.gov/indoor-air-quality-iaq/webinars-meetings-and-updates>

Contact Us <https://epa.gov/indoor-air-quality-iaq/forms/contact-us-about-indoor-air-quality> to ask a question, provide feedback, or report a problem.

LAST UPDATED ON AUGUST 15, 2023



# Discover.

### Accessibility Statement
<https://epa.gov/accessibility/epa-accessibility-statement>

### Budget & Performance
<https://epa.gov/planandbudget>

### Contracting
<https://epa.gov/contracts>

### EPA www Web Snapshot
<https://epa.gov/utilities/wwwepagov-snapshots>

### Grants
<https://epa.gov/grants>

### No FEAR Act Data
<https://epa.gov/ocr/whistleblower-protections-epa-and-how-they-relate-non-disclosure-agreements-signed-epa>

### Plain Writing
<https://epa.gov/web-policies-and-procedures/plain-writing>

### Privacy
<https://epa.gov/privacy>

# Connect.

### Data
<https://epa.gov/data>

### Inspector General
<https://www.epaoig.gov/>

### Jobs
<https://epa.gov/careers>

### Newsroom
<https://epa.gov/newsroom>

### Regulations.gov ↗
<https://www.regulations.gov/>

### Subscribe
<https://epa.gov/newsroom/email-subscriptions-epa-news-releases>

### USA.gov ↗
<https://www.usa.gov/>

### White House ↗
<https://www.whitehouse.gov/>

# Ask.

### Contact EPA
<https://epa.gov/home/forms/contact-epa>

### EPA Disclaimers
<https://epa.gov/web-policies-and-procedures/epa-disclaimers>

### Hotlines
<https://epa.gov/aboutepa/epa-hotlines>

### FOIA Requests
<https://epa.gov/foia>

### Frequent Questions
<https://epa.gov/home/frequent-questions-specific-epa-programstopics>

# Follow.

  
 

**Privacy and
Security Notice**

<https://epa.gov/privacy/pr
ivacy-and-security-notice>



*E. coli (Escherichia coli)*

# Questions and Answers

*Escherichia coli (E. coli)* bacteria normally live in the intestines of people and animals. Most *E. coli* are harmless and actually are an important part of a healthy human intestinal tract. However, some *E. coli* are pathogenic, meaning they can cause illness, either diarrhea or illness outside of the intestinal tract. The types of *E. coli* that can cause diarrhea can be transmitted through contaminated water or food, or through contact with animals or persons.

*E. coli* consists of a diverse group of bacteria. Pathogenic *E. coli* strains are categorized into pathotypes. Six pathotypes are associated with diarrhea and collectively are referred to as diarrheagenic *E. coli.*

- Shiga toxin-producing *E. coli* (STEC)—STEC may also be referred to as Verocytotoxin-producing *E. coli* (VTEC) or enterohemorrhagic *E. coli* (EHEC). This pathotype is the one most commonly heard about in the news in association with foodborne outbreaks.
- Enterotoxigenic *E. coli* (ETEC)
- Enteropathogenic *E. coli* (EPEC)
- Enteroaggregative *E. coli* (EAEC)
- Enteroinvasive *E. coli* (EIEC)
- Diffusely adherent *E. coli* (DAEC)

## Shiga toxin-producing *E. coli* (STEC)

### What are *Escherichia coli*? ∧

*Escherichia coli* (abbreviated as *E. coli*) are a large and diverse group of bacteria. Although most strains of *E. coli* are harmless, others can make you sick. Some kinds of *E. coli* can cause diarrhea, while others cause urinary tract infections, respiratory illness and pneumonia, and other illnesses. Still other kinds of *E. coli* are used as markers for water contamination—so you might hear about *E. coli* being found in drinking water, which are not themselves harmful, but indicate the water is contaminated. It does get a bit confusing—even to microbiologists.

### What are Shiga toxin-producing *E. coli* (STEC)? ∧

Some kinds of *E. coli* cause disease by making a toxin called Shiga toxin. The bacteria that make these toxins are called "Shiga toxin-producing" *E. coli*, or STEC for short. You might hear these bacteria called verocytotoxic *E. coli* (VTEC) or enterohemorrhagic *E. coli* (EHEC); these all refer generally to the same group of bacteria. The strain of Shiga toxin-producing *E. coli* O104:H4 that caused a large outbreak in Europe in 2011 was frequently referred to as EHEC. The most commonly identified STEC in North America is *E. coli* O157:H7 (often shortened to *E. coli* O157 or even just "O157"). When you hear news reports about outbreaks of "*E. coli*" infections, they are usually talking about *E. coli* O157.

In addition to *E. coli* O157, many other kinds (called serogroups) of STEC cause disease. Other *E. coli* serogroups in the STEC group, including *E. coli* O145, are sometimes called "non-O157 STECs." Currently, there are limited public health surveillance data on the occurrence of non-O157 STECs, including STEC O145; many STEC O145 infections may go undiagnosed or unreported.

Compared with STEC O157 infections, identification of non-O157 STEC infections is more complex. First, clinical laboratories must test stool samples for the presence of Shiga toxins. Then, the positive samples must be sent to public health laboratories to look for non-O157 STEC.  Clinical laboratories typically cannot identify non-O157 STEC. Other non-O157 STEC serogroups that often cause illness in people in the United States include O26, O111, and O103. Some types of STEC frequently cause severe disease, including bloody diarrhea and hemolytic uremic syndrome (HUS), which is a type of kidney failure.

---

### Are there important differences between *E. coli* O157 and other STEC?   ∧

Most of what we know about STEC comes from studies of *E. coli* O157 infection, which was first identified as a pathogen in 1982. Less is known about the non-O157 STEC, partly because older laboratory practices did not identify non-O157 infections. As a whole, the non-O157 serogroups are less likely to cause severe illness than *E. coli* O157, though sometimes they can. For example, *E. coli* O26 produces the same type of toxins that *E. coli* O157 produces, and causes a similar illness, though it is typically less likely to lead to kidney problems (called hemolytic uremic syndrome, or HUS).

---

### Who gets STEC infections?   ∧

People of any age can become infected. Very young children and the elderly are more likely to develop severe illness and hemolytic uremic syndrome (HUS) than others, but even healthy older children and young adults can become seriously ill.

---

### What are the symptoms of STEC infections?   ∧

The symptoms of STEC infections vary for each person but often include severe stomach cramps, diarrhea (often bloody), and vomiting. If there is fever, it usually is not very high (less than 101˚F/less than 38.5˚C). Most people get better within 5–7 days. Some infections are very mild, but others are severe or even life-threatening.

---

### What is hemolytic uremic syndrome (HUS), a complication of STEC infections?   ∧

Around 5–10% of those who are diagnosed with STEC infection develop a potentially life-threatening complication known as hemolytic uremic syndrome (HUS). Clues that a person is developing HUS include decreased frequency of urination, feeling very tired, and losing pink color in cheeks and inside the lower eyelids. Persons with HUS should be hospitalized because their kidneys may stop working and they may develop other serious problems. Most persons with HUS recover within a few weeks, but some suffer permanent damage or die.

---

### How soon do symptoms appear after exposure?   ∧

The time between ingesting the STEC bacteria and feeling sick is called the "incubation period." The incubation period is usually 3-4 days after the exposure, but may be as short as 1 day or as long as 10 days. The symptoms often begin slowly with mild belly pain or non-bloody diarrhea that worsens over several days. HUS, if it occurs, develops an average 7 days after the first symptoms, when the diarrhea is improving.

---

### Where do STEC come from?   ∧

STEC live in the guts of ruminant animals, including cattle, goats, sheep, deer, and elk. The major source for human illnesses is cattle. STEC that cause human illness generally do not make animals sick. Other kinds of animals, including pigs and birds, sometimes pick up STEC from the environment and may spread it.

How are these infections spread?

Infections start when you swallow STEC—in other words, when you get tiny (usually invisible) amounts of human or animal feces in your mouth. Unfortunately, this happens more often than we would like to think about. Exposures that result in illness include consumption of contaminated food, consumption of unpasteurized (raw) milk, consumption of water that has not been disinfected, contact with cattle, or contact with the feces of infected people. Some foods are considered to carry such a high risk of infection with *E. coli* O157 or another germ that health officials recommend that people avoid them completely. These foods include unpasteurized (raw) milk, unpasteurized apple cider, and soft cheeses made from raw milk. Sometimes the contact is pretty obvious (working with cows at a dairy or changing diapers, for example), but sometimes it is not (like eating an undercooked hamburger or a contaminated piece of lettuce). People have gotten infected by swallowing lake water while swimming, touching the environment in petting zoos and other animal exhibits, and by eating food prepared by people who did not wash their hands well after using the toilet. Almost everyone has some risk of infection.

## Where did my infection come from?

Because there are so many possible sources, for most people we can only guess. If your infection happens to be part of the about 20% of cases that are part of a recognized outbreak, the health department might identify the source.

## How common are STEC infections?

An estimated 265,000 STEC infections occur each year in the United States. STEC O157 causes about 36% of these infections, and non-O157 STEC cause the rest.  Public health experts rely on estimates rather than actual numbers of infections because not all STEC infections are diagnosed, for several reasons.  Many infected people do not seek medical care; many of those who do seek care do not provide a stool specimen for testing, and many labs do not test for non-O157 STEC. However, this situation is changing as more labs have begun using newer, simpler tests that can help detect non-O157 STEC.

## How are STEC infections diagnosed and when should I contact my healthcare provider?

STEC infections are usually diagnosed through laboratory testing of stool specimens (feces). Identifying the specific strain of STEC is essential for public health purposes, such as finding outbreaks. Many labs can determine if STEC are present, and most can identify *E. coli* O157. Labs that test for the presence of Shiga toxins in stool can detect non-O157 STEC infections. However, for the O group (serogroup) and other characteristics of non-O157 STEC to be identified, Shiga toxin-positive specimens must be sent to a state public health laboratory.

Contact your healthcare provider if you have diarrhea that lasts for more than 3 days, or it is accompanied by high fever, blood in the stool, or so much vomiting that you cannot keep liquids down and you pass very little urine.

## What is the best treatment for STEC infection?

Non-specific supportive therapy, including hydration, is important. Antibiotics should not be used to treat this infection. There is no evidence that treatment with antibiotics is helpful, and taking antibiotics may increase the risk of HUS. Antidiarrheal agents like Imodium® may also increase that risk.

## Should an infected person be excluded from school or work?

chool and work exclusion policies differ by local jurisdiction. Check with your local or state health department to learn
more about the laws where you live. In any case, good hand-washing after changing diapers, after using the toilet, and
before preparing food is essential to prevent the spread of these and many other infections.

---

How can STEC infections be prevented?                                                    ∧

- WASH YOUR HANDS thoroughly after using the bathroom or changing diapers and before preparing or eating food.
  WASH YOUR HANDS after contact with animals or their environments (at farms, petting zoos, fairs, even your own
  backyard).

- COOK meats thoroughly. Ground beef and meat that has been needle-tenderized should be cooked to a temperature
  of at least 160°F/70°C. It's best to use a thermometer, as color is not a very reliable indicator of "doneness."

- AVOID raw milk, unpasteurized dairy products, and unpasteurized juices (like fresh apple cider).

- AVOID swallowing water when swimming or playing in lakes, ponds, streams, swimming pools, and backyard "kiddie"
  pools.

- PREVENT cross contamination in food preparation areas by thoroughly washing hands, counters, cutting boards, and
  utensils after they touch raw meat. To learn more about how to protect yourself from *E. coli*, see CDC's feature, *E. coli
  Infection*.

last reviewed: December 1, 2014

Toxic Substances Portal

# ToxFAQs™ for Chloroform

CAS#: 67-66-3

PDF Version ■ [231 KB]

## What is chloroform?

Chloroform is a colorless liquid with a pleasant, nonirritating odor and a slightly sweet taste. It occurs naturally in the environment mainly in wet environments (tropical oceans, forest soil, rice fields, swamplands, and peat moorlands) but also can be found in dry grasslands and is released during volcanic eruptions and when organic matter is burned. It can also be formed in small amounts when chlorine is added to water. Chloroform is also man-made.

In the past, chloroform was used as an inhaled anesthetic during surgery, but it is no longer used during surgery due to availability of safer alternatives. Currently, chloroform is used as a solvent and to make other chemicals.

## What happens to chloroform in the environment?

Chloroform can enter the environment from manufacturing facilities or from treating water with chlorine. Since chloroform is made naturally in various environments and gets into the environment from human activities, it is likely found almost everywhere.

Chloroform evaporates quickly into the air from water and soil. In the air, it breaks down slowly, so it may travel long distances. Since chloroform dissolves easily in water, it can come back to the ground with the rain. Chloroform does not stick very well to soil and can therefore travel through the soil into the groundwater. Chloroform does not build up in large amounts in plants or animals.

## How can I be exposed to chloroform?

**General population exposure to chloroform is expected to be low. Individuals who live near hazardous waste sites, or work with chloroform or chlorinated water may be exposed to higher levels.**

Most people are exposed to very low levels of chloroform in indoor and outdoor air, food, and drinking water. If your home water supply is treated with chlorine, household activities such as showering, bathing, washing clothes or dishes, or preparing food may expose you to chloroform.

People who work in industries that use or manufacture chloroform may have increased risk for exposure. People who live near places that chlorinate water or near contaminated hazardous waste sites may also have increased risk of exposure. Increased exposure may also occur for individuals who spend a lot of time around chlorinated water, such as swimmers, lifeguards, or cleaners.

## How can chloroform affect my health?

Breathing low levels of chloroform for a short amount of time can cause you to become dizzy, tired, or give you a headache. At high levels, you may also have trouble breathing and may pass out. Breathing or drinking a large amount of chloroform can cause severe liver and kidney damage, and at very high exposure levels, can cause death.

Studies in animals showed that breathing chloroform caused damage to their nose that worsened with longer exposure periods. Lung damage also occurred in animals that breathed and/or drank chloroform. There is not clear evidence of developmental effects in pups born to animals exposed during pregnancy.

## Can chloroform cause cancer?

The ability of chloroform to cause cancer in people has not been well studied.

Tumors in the kidneys were seen in mice that breathed chloroform for a long time. Animals that drank chloroform for a long time developed cancer of the liver and kidneys.

The U.S. Department of Health and Human Services (DHHS) determined that chloroform is reasonably anticipated to be a human carcinogen based on sufficient evidence of carcinogenicity in experimental animals.

The U.S. Environmental Protection Agency (EPA) classified chloroform as likely to be carcinogenic to human by all routes of exposure at high dose levels that result in cell damage; it is not likely to be carcinogenic by any route at lower dose levels that do not cause cell damage.

The International Agency for Research on Cancer (IARC) determined that chloroform is possibly carcinogenic to humans based on inadequate evidence in humans and sufficient evidence in experimental animals.

## Can I get a medical test to check for chloroform?

There are tests to measure chloroform in your breath, blood, urine, breast milk, and body tissues. Chloroform does not stay in your body long, so these tests need to be done soon after you were exposed. These tests cannot predict whether you will have health problems from the exposure. Doctor's offices do not routinely offer these tests. If you think you have been exposed to this or any other chemical, talk to your doctor or nurse or call poison control.

## How can I protect myself and my family from chloroform?

If your drinking water is supplied by a public water system, you can contact them for information on chloroform levels in the water. If you have a private well for water, your local health department may be able to tell you if this chemical has been found in water in your area. You may also want to get your water tested by a certified laboratory.

If you work at a place that uses chloroform, make sure you are following all safety guidelines. Do not let your children play near facilities manufacturing chloroform or hazardous waste sites.

## For more information:

Call **CDC-INFO** at 1-800-232-4636, or submit your question online at https://wwwn.cdc.gov/dcs/ContactUs/Form

Go to ATSDR's Toxicological Profile for Chloroform: https://wwwn.cdc.gov/TSP/ToxProfiles/ToxProfiles.aspx?id=53&tid=16

Go to ATSDR's Toxic Substances Portal: https://wwwn.cdc.gov/TSP/index.aspx

Find & contact your ATSDR Regional Representative at https://www.atsdr.cdc.gov/DRO/dro_org.html

Page last reviewed: January 19, 2024

As a library, NLM provides access to scientific literature. Inclusion in an NLM database does not imply endorsement of, or agreement with, the contents by NLM or the National Institutes of Health.

Learn more: PMC Disclaimer | PMC Copyright Notice



Molecules. 2021 Oct; 26(19): 6060.                                        PMCID: PMC8511997
Published online 2021 Oct 7. doi: 10.3390/molecules26196060               PMID: 34641604

# Heavy Metals and Human Health: Possible Exposure Pathways and the Competition for Protein Binding Sites

Danuta Witkowska,* Joanna Słowik, and Karolina Chilicka

Aimin Liu, Academic Editor

## Abstract

Heavy metals enter the human body through the gastrointestinal tract, skin, or via inhalation. Toxic metals have proven to be a major threat to human health, mostly because of their ability to cause membrane and DNA damage, and to perturb protein function and enzyme activity. These metals disturb native proteins' functions by binding to free thiols or other functional groups, catalyzing the oxidation of amino acid side chains, perturbing protein folding, and/or displacing essential metal ions in enzymes. The review shows the physiological and biochemical effects of selected toxic metals interactions with proteins and enzymes. As environmental contamination by heavy metals is one of the most significant global problems, some detoxification strategies are also mentioned.

**Keywords:** heavy metals, proteins, exposure, interactions, bioremediation

## 1. Introduction

Some metal ions, such as Na(I), K(I), Mg(II), and Ca(II), are essential nutrients required for body function, others can be toxic even at very low concentrations. Regarding metals, micronutrients such as zinc, copper, iron, and manganese can also cause adverse effects when present in e: sive levels, or if their homeostasis is disturbed by some factors [1,2]. However, normally the play important and beneficial roles in human metabolism.



Back to Top

y metal ions can act as either cofactors or inhibitors in enzymatic pathways. It has been esti-
d that about half of all enzymes require a metal cofactor to be active and functional [3,4].

e are few definitions of "heavy metals". Generally, this term refers to metals and metalloids
relatively high densities (more than 5 g/cm$^3$), bioaccumulative potential along the food chain,
usually high toxicity to living organisms. Some researchers suggest replacing the controversial
"heavy metals" with "potentially toxic elements" [5].

group comprises toxic metals, including cadmium (Cd), lead (Pb), nickel (Ni), chromium (Cr),
ury (Hg), and metalloids, such as arsenic (As), from both natural sources and industry.

vell known that exposure to xenobiotic metals can cause gastrointestinal, respiratory, cardio-
lar, reproductive, renal, hemopoietic, and neurological disorders [6,7].

heavy metals stimulate through different pathogenetic links the progression of cancers and
e their sensitivity to treatment [8,9]. Oxidative stress (rising level of oxidative damage in a
caused by these metals destroys lipids, proteins and DNA molecules, and supports carcino-
sis. A wider discussion on this topic can be found in recent reviews [10,11,12].

ossible routes of exposure and the impact of heavy metals on human health are shown in
e 1. A detailed description of their mechanism of action is provided below.



gure 1

outes of exposure, the impact of toxic metals on human health, and the ways of limiting the risk caused by con-
ct with these elements (large arrow on the left). These adverse effects are caused by direct exposure to the toxic
etals in the environment or indirectly due to anthropogenic activity.

It is worth noting that similar cases exposure to a mixture of several different metals, pesticides, and other toxins) may have a cumulative effect [13,14].

The permissible levels of different heavy metal ions, set by World Health Organization (WHO) and European Medical Agency (EMA), range from ppt to ppm. As of 1 June 2020, arsenic (As), cadmium (Cd), lead (Pb) and mercury (Hg) are within the 10 chemicals of major public health concern, as shown recently in the WHO website [15]. Despite the fact that the toxicity of these elements is well-known, their various technological, medical and agricultural, applications cause still a huge threat to human health.

Despite many efforts of agencies such as the EMA, WHO or European Environment Agency (EEA), industrial development leads to rising levels of toxic metals in soil, water and air, constituting a direct and/or indirect threat for human health. This review provides a synthesis of existing knowledge on the sources of heavy metals toxic for humans, such as arsenic (As), cadmium (Cd), lead (Pb), mercury (Hg), and nickel (Ni), and their impact on human health, with a special emphasis on toxic metals' interactions with proteins. Biological detoxification strategies are also briefly described.

## 2. Heavy Metals in Food and Water

There are many ways heavy metals can enter the environment and agriculture. Heavy metal contamination of foods originates by weathering of the bedrock, air pollution directly, as well as soil irrigation with polluted waters and polluting groundwater [16]. Environmental contamination, primarily by industrial and human activity, refers to soil or groundwater that are the most common access routes of heavy metals such as lead, mercury, chromium, arsenic and cadmium. Reports have shown that increased amounts of heavy metals in the human daily diet are related to region, available food products and industry. Occasionally, a metal is not released into the environment, but human industrial activities result in exposure to those which are naturally occurring. For example, in the vicinity of a mine, soil contamination can be observed, which can result in the presence of heavy metals in local crops [17]. Certain regions and related industries are known to be specific for the emergence of these heavy metals in high concentrations, i.e., in China, areas surrounding coal-fired power plants are polluted by mercury up to 10 times more than the average soil sample 55 km away from these places [18].

Mercury has a significant influence on the human body. Reports have shown that mercury is largely ingested through the consumption of fish: marine, freshwater and starfish [18,19,20]. A study conducted in China revealed that mercury levels in children's blood varies depending on the region and on the rate of fish consumption [21]. The level of organic mercury (e.g., methylmercury) depends on the species of fish [22]. Bioaccessibility of mercury in food differs between raw and cooked foods and can be reduced by drinking green or black tea and black coffee during a meal [23,24], which can be correlated to the presence of phytates and tannins. The presence of mercury has also been confirmed in lettuce, water spinach, amaranth, rice, etc. [25]. Li et al. examined the impact of coal-fired power plants on vegetables and crops, and showed that mercury pollution is more prominent in leaves than roots [18].

however, absorption of mercury in the gastrointestinal track is approximately 7% to 15%, compared with 80% when inhaled [26]. This comparison shows that inhaling mercury vapors, which occurs, e.g., during small-scale gold mining, silver-ore work and dental work with amalgams, is dangerous. Mercury causes neurological problems and impairs kidney function. Additionally, a correlation has been determined between infertility and higher blood mercury levels [27].

Lead is another heavy metal which has an important impact on human health. Human poisoning is often associated with lead gasoline, mining and battery recycling, but the source of the poisoning may be unexpected in terms of wall paints or binders in sewer pipes [28,29]. In the Middle East, especially Egyptian villages, inhabitants produce household flour (the main component of their diet) using a stone mill, however, the stone is held with a lead binder, which causes contamination [30]. Lead and cadmium cause the loss of calcium and abnormal bone metabolism, leading to osteomalacia. Exposure to lead is especially dangerous for children under six years of age, as it disturbs development, growth and differentiation of nerve cells, and it causes damage of bone tissue. In the 1980s, the National Health and Nutrition Examination Survey (NHANES) indicated that an estimated 88% of children aged 1–5 years had blood lead levels (BLLs) ≥ 10 µg/dL. Since that time, the numbers have been rapidly decreasing. Recently, the new reference value of 3.5 µg/dL has been recommended to the American Center for Disease Control and Prevention (CDC), based on the 98th percentile of the 2011–2014 NHANES data [31]. Blood lead screening programs play an important role in reducing exposure risks, especially at the population level [32].

Cadmium has been found to greatly increase the risk of cardiovascular disease by smoking. Li et al. showed the effects of cadmium in tobacco as a cardiovascular disease factor [33]. Leafy vegetables, oilseeds, crops, organ meat, and nuts are known to contain high levels of cadmium [34]. In China, cadmium is mainly ingested via consumption of rice. Furthermore, the dismantling of Chinese e-waste exposes those in the vicinity to higher concentrations of cadmium, and those that consume rice grown in the area display a 60% increase in hazard quotient [35].

Food contamination with cadmium can come from natural sources, as well as from sewage and fertilization that gets through groundwater and runoff from fields into water bodies, causing the presence of cadmium in fish and oysters. One third of the total Cd(II) amount in the human body is accumulated in the liver and in the kidneys.

Due to the harmfulness of cadmium, which promotes serious health issues even after short-term exposure, complete avoidance is recommended. The adverse effects of chronic exposure to cadmium ions are as follows: anemia, insomnia, kidney damage, bladder and prostate cancers, and osteoporosis, among others [36].

However, unexpected ingestion of cadmium may originate from sources such as pigments and food dyes [37]. Additionally, studies have shown that a vegetarian diet possesses higher levels of cadmium compared to a nonvegetarian diet [33]. Spungen revealed that the highest ratio of cadmium is in vegetables and plant products such as sunflower seeds, spinach and potatoes, which can exceed 100 µg/kg of cadmium [38].

Consumption of cadmium has a particularly negative effect on fertility, moreover it can cause osteotoxicity and cardiovascular diseases [39]. Furthermore, it has been shown that iron deficiencies are associated with increased absorption of divalent metals, including cadmium, cobalt and manganese [40,41]. This condition was also confirmed in breastfed infants, whose iron-poor diets were associated with increased levels of lead, cobalt and cadmium [42].

Chromium occurs as trivalent chromium and hexavalent chromium in the environment. In food, chromium is present in its low-toxicity trivalent form. However, in changing conditions (e.g., pH) chromium(III) can convert to chromium(VI). Trivalent chromium is found in nuts, broccoli, whole-grain products, and eggs [43]. Studies have examined the impact of chromium on glucose metabolism and fat loss. Hexavalent chromium is toxic and carcinogenic. Chromium(VI) is primarily generated by human activity, and is used in leather tanning, chromium plates, wood preservation, etc. Areas with tanning factories are frequently contaminated by chromium(VI) where sewage waste affects the composition of groundwater and consequently soil [44]. In Kanpur, India, drinking water contains high concentrations of chromium(VI) exceeding the average by approximately 390-fold and causes digestive, skin and ocular problems [45].

Arsenic is a well-known toxin and carcinogen. It can be found in the air, water and soil. Hopenhayn et al. examined the association between consumption of arsenic in drinking water and infant birth weight. Higher dosage of arsenic negatively affected children's weight by approximately 57 g [46]. Geothermal activity in some regions promotes increased levels of arsenic.

In some countries, the CCA (copper-chromium-arsenic) preservative substance has been used to treat timber. This leads to the presence of heavy-metal pollution in the soil. Hence, CCA is the source and cause of heavy metals, such as arsenic, in food [47]. Singh and Ghosh tested arsenic levels in water, soil and food, where the concentration of arsenic was much higher than the WHO's recommended limit for drinking-water (10 µg/L). Moreover, residents of contaminated areas are constantly exposed to cumulative effects of consumed arsenic from wheat, water and animal products [48].

The most common way of poisoning and intake of heavy metals is the daily consumption of contaminated food. Studies have proven that pollution of the main dietary ingredients is the primary cause of adverse effects. Orisakwe et al. showed that residents of South-East Nigeria who consumed vegetables and rice contaminated with high ratio of heavy metals, exceeded acceptable limits for Pb, Ni, and Cd [49].

Human activities such as traffic, industry and modern agriculture are also the reasons for honey contamination by toxic metals (particularly Ni and Cr). This situation occurs when nectar is collected by honeybees in the flora of serpentine soils with elevated Ni content [50]. The production of paddy rice at serpentine sites in Taiwan has been revealed as the main source of Ni(II) exposure for humans living there [51]. Nickel can also be found in cocoa and chocolate. It is worth mentioning that Ni(II) ions are important for some plant and bacterial enzymes, however, nickel pollution is increasing in the environment [52]. In Europe, the highest levels of nickel in vegetables

found in Italy, nonetheless, the values found were of no concern for human or animal health A study by Zeinali et al. on the dietary intake of Cd, Cr, Pb, Cu, and Ni also showed that nickel nt in meat was acceptable, and the highest hazard was estimated for Pb and Cd [54].

a and colleagues examined over 100 samples of meat, vegetables, and fish from African's markets, and showed using ICP-OES and ICP-MS methods that the content of Cd, Cr, Hg, Pb, d As exceeded WHO standards, and had a specifically negative impact on residents' health

icou et al. determined that approximately 10% of lead and 10–50% of cadmium from the nt found in cocoa powder was bioavailable, and the concentration of these heavy metals de-d on geographical origin [56]. Additionally, the content of heavy metals in a specific product lepend on the production stage within a plant. In the case of maize processing, germs pos-he highest concentration of heavy metals [57]. Proper food preparation and processing are mportant in reducing heavy-metal contamination of food products. Many beverages are pol-by heavy metals including lead, cadmium, and arsenic [58]. Even juicing vegetables and brewing coffee or extracting ginseng can change the heavy-metal concentration in the prod-9].

est way to limit heavy metal pollution is to decrease their influx into the environment and to ol their concentration from the cultivation process to the consumption stage. Increased eness and expansion of knowledge regarding the impact of heavy metals on health and possi-ths to reduce and eliminate such pollutants should be the focus of future research.

avy Metals in Cosmetics

/ metals, which are present particularly in colored cosmetics, may be there either intention-r as impurities introduced through raw materials that are used in the production process. contamination may stem from improper treatment of the raw material or the production ss [60,61].

ding to Regulation No 1223/2009 of the European Parliament and of the Council, the pres-of heavy metals (comprising Cd, Pb, As, Ni, Cr and Hg) in cosmetic products is considered erous for human health [62]. However, some of these elements are added to cosmetics in or-o support the proper metabolic and physiological functioning of the skin, and the regulations y state the permissible content of these heavy metals. Among the products that contain the e-mentioned metals are those that are applied to the mucous membrane, such as lipsticks and osses, beauty creams and lotions, but also hair care preparations [63,64,65].

resence of lead in cosmetics is strictly prohibited in cosmetics in accordance with the provi-of the above-mentioned act [66]. It can be introduced into the body through the digestive espiratory tracts or absorbed through the skin or mucous membranes. Research has shown ermanent exposure to even low levels of lead can cause eczema and skin contact allergies.



# Enforcement News

## $2.5 million settlement reached for Mule Creek State Prison violations of Clean Water Act

### *Case involves unpermitted stormwater discharges into Mule Creek*

**March 29, 2021**                                    **Contact:** Blair Robertson
                                              Blair.Robertson@Waterboards.ca.gov

**IONE** – The California Department of Corrections and Rehabilitation has agreed to pay a $2.5 million penalty for discharging comingled stormwater at Mule Creek State Prison, in violation of the Clean Water Act. The penalty was assessed for unpermitted discharges between January 2018 and April 2019 to Mule Creek, a tributary to Dry Creek and the Sacramento-San Joaquin Delta.

The case began three years ago when the Central Valley Regional Water Quality Control Board (Central Valley Water Board) received a complaint that the prison was discharging wastewater into the nearby creek. Central Valley Water Board staff confirmed discharges were occurring from the prison to Mule Creek.

Water quality testing showed the discharge contained concentrations of numerous waste constituents normally found in domestic and industrial wastewater, including coliform organisms, total suspended solids, biochemical oxygen demand, chemical oxygen demand, nutrients, surfactants, metals, volatile organic compounds, and semi-volatile organic compounds. Elevated levels of these constituents are a risk to human health and can reduce dissolved oxygen levels in the water, which negatively impacts aquatic life.

Under the terms of the settlement, the Department of Corrections and Rehabilitation will pay $1,605,811 of the settlement to the state's Water Pollution Cleanup and Abatement Account. The remaining $894,189 of the penalty will be used to complete two Enhanced Compliance Projects. The first project will replace the landscape irrigation system at Mule Creek State Prison. Installing new piping for the landscape irrigation system will reduce non-storm water flows (from irrigation) into Mule Creek.

"This was a preventable penalty, as the California Department of Corrections and Rehabilitation was aware of discharges flowing into Mule Creek on a regular basis and chose not to notify the Regional Board or obtain the proper permits," said John J. Baum, assistant




executive officer for the Central Valley Water Board. "Allowing the agency to use a portion of the penalty for landscape irrigation replacement should reduce these non-storm water flows."

The Municipal Storm Water Program regulates storm water discharges from municipal separate storm sewer systems throughout California. This includes roads with drainage systems, municipal streets, catch basins, curbs, gutters, ditches, man-made channels, or storm drains owned or operated by the state.

The Central Valley Water Board is a state agency responsible for protecting water quality and ensuring beneficial uses, such as aquatic habitat and human health, for 11,350 miles of streams, 579,110 acres of lakes, and the largest contiguous groundwater basin in California.

### ###

CLICK HERE FOR WEEKLY SPECIALS

As a public service, this article has unlimited access. To support public service journalism, call (209) 223-8761 to subscribe.

https://www.ledger.news/news/cdcr-agrees-to-clean-up-its-mess-at-mule-creek/article_2be592c4-f9bd-11ed-a2cb-b39c8bcad177.html

FEATURED

# CDCR agrees to clean up its mess at Mule Creek

## Settlement expected to stop sewage pollution from prison

Ledger Dispatch
May 23, 2023



...rm water at Mule Creek State Prison.
...URTESY PHOTO/David Anderson

...what is being labeled by county officials as a "huge victory" for Amador County, the California ...partment of Corrections and Rehabilitation (CDCR) on Thursday, May 18 entered into a ...nsent decree to settle a Clean Water Act lawsuit brought by Amador County, agreeing to ...dertake $11 million in infrastructure improvements at Mule Creek State Prison to provide ...ch-needed repairs to the prison's wastewater collection system and two new bioswales to ...at stormwater before it reaches Mule Creek.

...his settlement means the pollution by sewage from the prison will end," said Chris Shutes, ...ecutive Director of the California Sportfishing Protection Alliance (CSPA), which partnered ...h Amador County on the lawsuit. "This settlement will improve conditions for prison inmates ...d staff, for the City of Ione, for local landowners and for Amador County."

"The Department of Corrections itself identified widespread leaks and capacity deficiencies in both sets of Mule Creek State Prison's sewer lines," Shutes said. "The pollution has affected prison grounds, the lands downhill from the prison, Mule Creek, Dry Creek, and in very high flows the Mokelumne and Cosumnes rivers and the Delta.

"CSPA thanks Amador County for its collaboration. CSPA has stood shoulder to shoulder with the county in the past, including the assurance of Sierra lake protections in Amador v. El Dorado in 1999. We strongly value our partnerships with the county on areas of mutual interest, including working together to make sure that CDCR abides by its commitments under the terms of this settlement."

At the insistence of local activist Katherine Evatt, Richard McHenry, CSPA's Director of Permits and Compliance, flagged the issues with Mule Creek State Prison for CSPA in 2020 and provided guidance as the case developed. Dr. Robert Emerick ably assisted CSPA as its technical expert witness. After obtaining a court order to inspect and take water samples at the maximum-security prison, CSPA and Amador County analyzed the samples and found high concentrations E. coli and fecal coliform, which CDCR had long attributed to geese, deer or other animals in its reporting to the Regional Water Quality Control Board. CSPA and the County also analyzed the samples for Pharmaceuticals and Personal Care Products ("PPCPs") and found caffeine, acetaminophen and other pharmaceuticals in the prison's storm water system – during dry weather.

Based on these findings, plaintiffs were prepared to prove at a trial next month that the prison's sewage system was contaminating its storm water discharges through "exfiltration" and "infiltration" problems caused by broken or unmaintained pipe systems. The parties estimate that the consent decree will require approximately $10,000,000 in state funding to implement.

The case was one of the last major water quality actions initiated by CSPA's late Executive Director Bill Jennings. CSPA was represented in this matter by Erica Maharg and Kenya Rothstein of the Aqua Terra Aeris Law Group, and William Carlon and Andrew Packard at the Law Offices of Andrew L. Packard. Best, Best and Krieger's Christopher Pisano, Rebecca Andrews, Gene Tanaka and Shawn Hagerty represented Amador County.

Amador County initiated a Clean Water Act citizen suit against CDCR in January of 2021. The Clean Water Act prohibits the discharge of pollutants to surface waters, except as authorized by a permit. The county's lawsuit alleged that the prison discharges bacteria, pathogens, heavy metals and other pollutants to Mule Creek in violation of the Clean Water Act permit covering the prison. Extensive monitoring and reporting activities undertaken by CDCR show that the prison's wastewater collection system has structural deficiencies which allow untreated sewage to leak into the surrounding area, including into the storm drain system. The storm drain system drains into Mule Creek.



Under the terms of the consent decree, CDCR has seven years to repair all identified deficiencies in the prison's wastewater collection system and construct bioswales to treat stormwater and non-stormwater flows that reach Mule Creek. During this time, CDCR will divert dry weather flows to the wastewater treatment plant instead of discharging them to Mule Creek, will continue to sample and analyze the prison's stormwater discharges for the presence of pollutants, and will report those results publicly. CDCR also agreed to pay $820,000 to reimburse the county for the costs of bringing the lawsuit.

The county's lawsuit was consolidated with a similar lawsuit filed by the CSPA around the same time. The consent decree settles both actions. The Department of Justice has 45 days to review the consent decree and provide comments. After that period of time, the consent decree is expected to be entered as the judgment of the court in both consolidated actions.

"Huge victory for the folks of Amador and our waterways," City of Ione Councilmember Alison McFayne said. "Thank you Amador County and the California Sportfishing Protection Alliance for joining forces and going after the big fish."

In a statement from the CSPA on the settlement, CSPA Executive Director Chris Shutes said the facts in the case were brought to the attention of the Regional Water Quality Control Board in 2018, when they began receiving reports from local citizens describing brownish, steaming hot water discharging from the prison directly into Mule Creek.

'This settlement will improve conditions for prison inmates and staff, for the City of Ione, for local landowners and for Amador County.'

Chris Shutes

*Executive Director, California Sportfishing Protection Alliance*

MORE INFORMATION





The complicated - and sometimes confusing - tale of contamination stemming from Mule Creek State Prison

y of Ione votes to reject CDCR water as debate over contamination persists

 

🔗 Share: 📘 𝕏 🖼    About Us    Contact Us    Subscribe

⚙ Settings

Home  |   |  Water Issues  |  Enforcement  |  Mule Creek State Prison

# Mule Creek State Prison Compliance Issues and Regulatory Strategy

 Quick Links

- Facility Background and Overview
- Waste Discharge to Land Requirements
- Small Municipal Separate Storm Sewer System (MS4)
- Industrial Stormwater Genera Permit (IGP)
- SSO General Order

## Facility Background and Overview

The Mule Creek State Prison facility (MCSP) is owned and operated by the California Department of Corrections and Rehabilitation (CDCR). MCSP is located approximately 1 mile west of the City of Ione, California, and approximately 10 miles west of the City of Jackson. Mule Creek runs through the center of the facility.

The Central Valley Regional Water Quality Control Board (Central Valley Water Board) regulates the operations that occur at the MCSP facility with several water quality permits. Each permit has prohibitions, conditions, and requirements to operate and monitor the covered component such that beneficial uses are not impacted, and environmental health is protected:

- The wastewater collection system is regulated under the Sanitary Sewer System General Order (SSO General Order), Water Quality Order No. 2006-0003-DWQ.
- The wastewater treatment plant, effluent storage reservoir, and on-site land application areas are regulated by the Waste Discharge Requirements (WDRs) Order R5-2015-0129 from the Waste Discharge to Land Permitting Program.
- The storm water discharge to Mule Creek is regulated under the National Pollutant Discharge Elimination System General Permit for Waste Discharge Requirements for Storm Water

Discharges from Small Municipal Separate Storm Sewer Systems (MS4), WQ Order 2013-0001-DWQ, as amended (Small MS4 General Permit).

- CDCR has also submitted a No Exposure Certification for the Industrial Stormwater General Permit (IGP).

The scope, primary concerns, and compliance strategy of each of these permits is described in the modules below, along with links to the program pages, permits, associated monitoring reports, enforcement actions, and program links.

# Waste Discharge to Land Requirements

WDRs Order R5-2015-0129 defines the requirements, prohibitions, monitoring, and reporting associated with the wastewater treatment plant, effluent storage reservoir, and on-site land application areas. A blend of domestic and industrial wastewater is generated, treated, and disposed of at MCSP. Currently, MCSP houses approximately 4,000 inmates and employs 1,250 CDCR staff full time. MCSP generates an unknown volume of industrial waste from several industrial operations, which is discharged to the sanitary sewer system. These operations include a coffee roaster, meat processor and smokehouse, textile manufacturing operation, and a large-scale laundry operation that serves several other prisons across the state. In addition, MCSP receives an unknown amount of domestic waste flows from the California Department of Forestry Fire Academy and a small amount of wastewater from the closed Preston Youth Authority facility, both located adjacent to MCSP. These wastewater flows are combined and treated at the on-site wastewater treatment plant. Secondary disinfected effluent is stored in an effluent reservoir and disposed of the on-site land application areas, an effluent storage reservoir, or Preston Reservoir. CDCR has also built and periodically operates an effluent export pipeline to discharge effluent to the City of Ione tertiary plant for further treatment and irrigation of the Castle Oaks Golf Course. This off-site beneficial reuse is not described or permitted in the current WDRs.

| Compliance Concern | Strategy to Return to Compliance |
|---|---|
| Insufficient flow and composition data to determine threat to water quality and public health posed by the treatment and disposal of the industrial wastewater | Revised Monitoring and Reporting Program (MRP) R5-2015-0129 was issued in October 2021 to require monitoring necessary to collect needed data. Based on that data, the WDRs will be updated to ensure beneficial uses are protected. Data will also be sent to the County to make public health recommendations. |
| Lack of treatment process for industrial waste | Future WDRs will be developed using the data on the industrial waste stream collected under Revised MRP R5-2015-0129 and will include requirements and |

| Compliance Concern | Strategy to Return to Compliance |
|---|---|
| | upgrades to the treatment train as needed to address industrial waste constituents. |
| Insufficient wastewater effluent disposal capacity | The current WDRs require CDCR to develop additional disposal capacity to make up for the increased prisoner population and loss of spray fields caused by the 2015 prison expansion. However, the disposal plans of Sutter Creek and the City of Ione will change drastically in July 2022. Therefore CDCR, Ione, and Sutter Creek will be required to submit water balances consistent with each other to determine the disposal deficit. |
| Overloading of specific spray fields potentially causing subsurface seepage into Mule Creek | Symptom of insufficient disposal capacity, see above. |
| Nitrate and VOC impacts to groundwater | Symptom of insufficient disposal capacity, see above. |

# Land Discharge Waste Discharge Requirement (WDR) Permit Documents

- WDR R5-2015-0129
- Revised Monitoring and Reporting Program R5-2015-0129 (Rev1)

# Recent Enforcement Documents

- 23 September 2020 Notice of Violation (will provide document, is not currently online)

# Monitoring Reports

Please contact us for copies of these documents.

- Monthly Waste Water Treatment Plant Reports required by WDRs (will provide document, is not currently online)
- Quarterly Groundwater Reports required by WDRs (will provide document, is not currently online)
- Annual Reports required by WDRs (will provide document, is not currently online)

# Small Municipal Separate Storm Sewer System (MS4)

On 28 December 2017, Central Valley Water Board staff received a complaint of a discharge of wastewater from an unknown source into the storm water system and subsequently into Mule Creek. In response, Central Valley Water Board staff inspected MCSP on 4 January 2018 and collected samples. The results indicated that the discharge exhibited the characteristics of domestic and industrial wastewater, and exceeded several applicable regulatory limits, resulting in the issuance of a Water Code Section 13267 Order (13267 Order) on 14 February 2018. As part of the 13267 Order, CDCR completed monitoring and an investigation of the storm water and sanitary sewer systems to determine the source of the waste. It determined that both systems had numerous defects allowing liquid to infiltrate and ex-filtrate and that groundwater was mounded beneath MCSP as a result. CDCR's Investigation Findings Report and Central Valley Water Board Staff's Review Memo for that report are linked below.

During the investigation, Central Valley Water Board staff determined that the storm water system at MCSP may pose a threat to water quality and storm water discharges from MCSP should be regulated under the Small MS4 General Permit. On 8 February 2019 the Central Valley Water Board adopted Resolution R5-2019-0006 designating MCSP as a Non-Traditional MS4, and on 10 April 2019 MCSP was designated as a Regulated Small MS4 by the State Water Resources Control Board (State Water Board). The Small MS4 General Permit requires CDCR to develop and implement a storm water control program for MCSP to reduce the discharge of pollutants from its MS4 to Mule Creek and ensure compliance with applicable water quality requirements. Due to potential water quality impacts to Mule Creek while the MCSP storm water control program is being fully developed and implemented, and to ensure compliance with the Small MS4 General Permit requirements, the Central Valley Water Board determined that an interim monitoring and reporting program is necessary to monitor MS4 discharges from MCSP to Mule Creek. The Central Valley Water Board issued a 13383 Order to perform monitoring and reporting on 6 August 2020. The 13383 Order was initially updated on 16 December 2020, followed by an additional update on 30 November 2021.

On 18 February 2021, the Central Valley Water Board approved Settlement Agreement and Stipulation for Entry of Administrative Civil Liability and Administrative Civil Liability Order (Stipulated Order), Order No R5-2021-0001 regarding the unpermitted discharge of co-mingled storm water and wastewater to Mule Creek from the MCSP MS4. The scope of the Stipulated Order only included discharges occurring between the discovery of waste constituents in the discharge by Central Valley Water Board staff on 18 January 2018 and 10 April 2019, which is when MCSP enrolled in the Small MS4 General Permit. As part of the Stipulated Order, CDCR agreed to defer funds from the penalty amount to the following Enhanced Compliance Actions (ECAs): a Landscape Irrigation System Replacement Project to repair broken landscape irrigation pipes that are contributing to excessive dry weather flows into the MS4 and a microbiological study (Microbial Study) performed by the Southern California Coastal Water Research Project. The Landscape Irrigation System Replacement Project is expected to be completed in March 2025. The Microbial Study is complete but unfortunately was not performed with EPA-certified methods and was mostly inconclusive, although human biomarkers were detected in Mule Creek.

| Compliance Concern | Strategy to Return to Compliance |
|---|---|
| Insufficient flow and composition data to determine threat to water quality and public health posed by the discharges to Mule Creek from the MS4 | The updated 13383 Order requires the collection of monitoring data needed to determine the threat to water quality and public health posed by MS4 discharge. The Small MS4 General Permit requires CDCR to address any illicit discharges occurring to the system once they are found. |
| Discharges from the MS4 have been occurring during long periods of dry weather | As part of the 2021 Stipulated Order, CDCR is required to repair the landscape irrigation system. In addition, Central Valley Water Board staff reviewed CDCR's Non-Storm Water Discharge Report and determined that the irrigation runoff from defects in the irrigation system does not meet the Small MS4 General Permit's definition of incidental runoff. As required by the Small MS4 General Permit, CDCR submitted a Non-Storm Water Discharge Elimination Plan (NSWDE Plan) to eliminate the non-storm water runoff. This NSWDE Plan is currently under Central Valley Water Board staff review. |
| The Stormwater System Investigation Findings Report (Report) detailed numerous defects and locations of infiltration in the MS4 system | The Report concluded that there are defects in the sanitary sewer and irrigation systems and MS4. For Non-traditional MS4s, the Small MS4 General Order requires that illicit discharges into MS4 be corrected once the source is identified. |

- Small MS4 General Permit WQ Order 2013-0001-DWQ
- MS4 Designation Resolution R5-2019-0006
- Revised MS4 13383 Order (Replaced on 30 November 2021)
- Revised MS4 13383 Order

# Enforcement Documents

- 14 February 2018 13267 Order (will provide document, is not currently online)
- 1 November 2019 Stormwater Investigation Findings Report (will provide document, is not currently online)
- 7 December 2020 Stormwater Investigation Findings Report Review Memo (will provide document, is not currently online)
- 18 February 2021 Settlement Agreement Administrative Civil Liability Order R5-2021-0001

- 18 February 2021 Board Presentation for ACL Adoption (will provide document, is not currently online)

## Monitoring Reports

- Historical data of the Discharge to Mule Creek collected under the 13267 Order (will provide document, is not currently online)
- All MS4 monitoring reports are available to the public via the Stormwater Multiple Application and Report Tracking System (SMARTS):
  - California Storm water Multiple Applications and Report Tracking System

## Industrial Stormwater General Permit (IGP)

CDCR filed a No Exposure Certification (NEC) on 22 May 2018, which certifies that all industrial activities occur indoors and therefore they should be exempt from certain Industrial Stormwater General Permit requirements. Stormwater staff inspected the facility on 27 January 2021 and determined that the NEC is applicable here. Therefore MCSP is not regulated under the IGP.

- Industrial Stormwater page

## SSO General Order

On 2 May 2006 the State Water Board adopted the SSO General Order, Order No. 2006-0003-DWQ. This Order requires all federal and state agencies, municipalities, counties, districts, and other public entities that own or operate sanitary sewer systems greater than one mile in length and collect and/or convey untreated or partially treated wastewater to a publicly owned treatment facility to enroll and comply with the requirements described within.

As part of previous enforcement actions taken by the Central Valley Water Board for wastewater spills from the collection system to Mule Creek MCSP, CDCR was enrolled in the SSO General Order on 5 December 2014. The Order includes requirements for the maintenance, monitoring, and repair of the sanitary sewer system. Based on the 1 November 2019 Stormwater Investigation Findings Report, adequate maintenance and repair have not been performed, and the Board is evaluating enforcement.

| Compliance Concern | Strategy to Return to Compliance |
|---|---|
| The Stormwater System Investigation Findings Report detailed numerous defects | Board staff is reviewing the most recent Sanitary Sewer Maintenance Plan and will provide formal |

| Compliance Concern | Strategy to Return to Compliance |
|---|---|
| and locations of infiltration in the storm water collection system | communication to CDCR stating how to address these issues and come back into compliance with the SSO General Order. |

## SSO General Order Permit Documents

- Sanitary Sewer Overflow Reduction Program page
- Sanitary Sewer Overflow (SSO) General Order WQO-2006-0003

## Sanitary Sewer Management Plans (SSMP)

- 2020 SSMP (will provide document, is not currently online)

---

✉ Email Subscription List

Subscribe to the Mule Creek State Prison Compliance Issues and Regulatory Strategy email list to receive notifications and updates.

**✶Email Address**

[ Submit ]

---

☎✉ Contact Us

- **Assistant Executive Officer overseeing Enforcement:**
  JJ Baum
  Assistant Executive Officer
  John.Baum@waterboards.ca.gov

- **Land Discharge and Construction and Industrial Stormwater Questions**
  Kari Holmes
  Supervising Water Resource Control Engineer
  Kari.Holmes@waterboards.ca.gov

- **MS4 Questions**
  Anne Walters
  Environmental Program Manager I
  Anne.Walters@waterboards.ca.gov

- **CDCR Questions**
  Gregor Larabee
  Industrial Hygienist
  (916) 255-2162
  Gregor.Larabee@cdcr.ca.gov

- **Web page problems:** webmaster5@waterboards.ca.gov

*⊘* Report an Environmental Concern

---

👥 **Meetings & Presentation Material**

---

- **Mule Creek State Prison Facility Public Meeting - December 14, 2021**
  - Meeting Video
  - Meeting Presentation

---

age last updated 3/17/23)

ter is a precious resource in California, and maintaining its quality is of utmost importance to safeguard
e health of the public and the environment.

atewide Campaigns

EPA Water Sense
Report an Environmental Concern
Save Our Water
Flex Alert
Register to Vote

uick Links

Ex Parte Communications
Fees
Make a Payment
Grievance Procedure
Help / Business Help

Do I Need a Permit?

What We Do



**Resources**

CEDEN
Data & Databases
Drought Information
Language Access Complaint
MyWaterQuality
Performance Report
Publications & Forms
Queja de Acceso al Idioma
Tribal Affairs
Useful Links
Website Index

Working with the Board

Board Priorities
Regional Board Priorities
Employment
Executive Officer's Reports
Frequently Asked Questions
Grants & Loans
Laws / Regulations
Plans / Policies
Public Participation
Public Records Center

Back to Top

Privacy Policy

Contact Us

Conditions of Use

Accessibility



Website Accessibility Certification

Copyright © 2024 State of California

The California Water Boards include the State Water Resources Control Board and nine Regional Boards

The State Water Board is one of six environmental entities operating under
the authority of the California Environmental Protection Agency

Cal/EPA | ARB | CalRecycle | DPR | DTSC | OEHHA | **SWRCB**

File an Environmental Complaint



STATE OF CALIFORNIA
PIU 3 (Rev. 07/2021)

Department of Justice
Page 2 of 4

**COMPLAINT ABOUT PEACE OFFICERS/**
**LAW ENFORCEMENT AGENCY**
Please read the Information Collection,
Use and Access notice on page 4.

**Rob Bonta**
**ATTORNEY GENERAL**

**Mail Form to:**

PUBLIC INQUIRY UNIT
(916) 210-6276 / (800) 952-5225 Toll Free - CA only
TTY/TDD (800) 735-2929 (California Relay Service)
For TTY/TDD outside California contact your state's relay service
number at  http://www.fcc.gov/cgb/dro/trsphonebk.html
AG Web Site: http://www.oag.ca.gov/

**Public Inquiry Unit**
**Office of the Attorney General**
**P.O. Box 944255**
**Sacramento, CA 94244-2550**

| PRINT FORM | RESET FORM |

### SECTION 1 - POLICY FOR REVIEWING CITIZEN COMPLAINTS AGAINST LAW ENFORCEMENT

Under the general policy of the Department of Justice, your complaint about a law enforcement agency or its employee(s) must be addressed first to appropriate local authorities.  The Attorney General will review complaints for possible investigation when substantive allegations of unlawful conduct are made and all appropriate local remedies have been exhausted.

### SECTION 2 - TYPE OF COMPLAINT

☐ This is a complaint about a law enforcement officer.       ☒ This is a complaint about a law enforcement agency.

### SECTION 3 - YOUR INFORMATION

First Name: *Xavier*          MI: *Lumar*    Last Name: *O'Weidl*

Address:

City: *Ione*          County: *Amador*          State: *CA*       Zip Code: *95640*

Phone:          E-mail Address:          Year of Birth (optional):

Gender (optional): ☐ Female  ☒ Male  ☐ Transgender Woman/Girl  ☐ Transgender Man/Boy  ☐ Gender Nonconforming

☐ Not Listed _____          ☐ Prefer Not to Answer

Ethnicity (optional): ☐ American Indian / Alaska Native  ☐ Asian / Pacific Islander  *Trinidadian*  ☐ ~~Black / African American~~

☐ Hispanic / Latinx  ☐ Middle Eastern  ☐ South Asian  ☐ White / Caucasian  ☐ Multiracial _____

☐ Not Listed          ☐ Prefer Not to Answer

Relationship to Incident: ☒ Victim  ☒ Witness  ☐ Family Member / Friend  ☐ Concerned Citizen

### SECTION 4 - INCIDENT INFORMATION

Name of Agency / Agencies Involved:
*Attorney General(s)    California Rob Bonta Bar No. 202068.*
*Joshua B. Hoad, State Bar No. 864078, Supervising Deputy Att Gen.*
*Necula M Green, State Bar No. 307570. Deputy Att Gen.*

Name of Officer(s) Involved (Provide Badge Numbers if Known):

### SECTION 5 - INCIDENT DETAILS

Date of Incident:     Time:     Location:

Type of Incident: ☐ Arrest  ☐ Call for Service  ☐ Job Related Dishonesty  ☐ Officer Involved Shooting  ☐ Officer Involved Sexual Assault

☐ Traffic Stop  ☐ Use of Force - Baton/Fist Strikes  ☐ Use of Force - Carotid Hold  ☐ Use of Force - K-9

☐ Use of Force - Less Lethal Projectile  ☐ Use of Force - Pepper Spray/OC/Tear Gas  ☐ Use of Force - Taser
☐ Use of Force - Other *The Attorney General Has & is Abusing LOCR To Commit The Following Act Violations of Cnt Clean Water Act, Misattribution of Funds;*

Is There a Summons or Arrest Associated with this Incident?          YES ☐  NO ☒

Does the Complaint Involve the Death of a Civilian?          YES ☐  NO ☒

If Yes, Name of Civilian:

Names of any Persons Injured: *Xavier Lumar O'Weidl*

### SECTION 6 - EXHAUSTION OF LOCAL REMEDIES

Has this incident been reported to another agency?          YES ☒  NO ☐



STATE OF CALIFORNIA
PIU 3 (Rev. 07/2021)

**COMPLAINT ABOUT PEACE OFFICERS/
LAW ENFORCEMENT AGENCY**

Department of Justice
Page 3 of -

**Rob Bonta
ATTORNEY GENERAL**

## SECTION 7 - NARRATIVE/SUMMARY OF INCIDENT

Please provide specific information about the alleged unlawful conduct and detail your efforts to resolve this complaint at the local level. If more space is needed, attach additional pages.

**Total # Pages Attached:**

• THE ATTORNEY GENERAL'S OFFICE, TO MY BELIEF ARE IN COMPLETE POSSESSION OF FACTUAL DOCUMENTATION THAT WILL CLEARLY DEMONSTRATE THE INHUMANE LIVING CONDITION OF CLEAN STATE DRINKING WATER Violation. AND THAT IS A Violation OF California PENAL WATERS ACT ["] Health & Saf Codes § 25249.5. As Well as a very large Amount of documents that show Knowledgeable Awareness of a serious dangerous health risk of harmfull Chemicals in the drinking water at (masp) Mule Creek State Prison. In which having the contamination of sewage, waste material moving through busted Corroded piping, underneath all the housing units gouted by "state employees at mule creek prison." ] A Master Plummber interviewed by the DISPATCH LEDGER NEWPAPER further attesting to Multiple Cross Connection of Sewage pipes / Infrastructure after having had viewed the photos of the plumbing system. Building code violations of plumbing system.

• All information relevant to, and that which has a nexus. Water table samples tested, as well as all drinking wells or outside water test of drinking water. Fines, for Clean Water Violation of California. By the CENTRAL REGIONAL WATER Control Board & the E.P.A. all water test for the prison. All Civil Suits when or by settled All CALIFORNIA DEPARTMENT OF CORRECTION & REHABILITATION Memo's Computer generated or not.
Court Orders for Specific Performance to be fulfilled an any and all contracts not att heard to.

• As there are numerous of witness experts that will also attest to a criminal act of Misappropriation of Funds Millions of requested and allotted funds.
Requested through a chain of custody for clearance.

And all of these documents all lead us to a crime. And plantiff belief is that the attorneys generals office does have in there possession a showing of many criminal actions.

## SECTION 8 - STATEMENT

I affirm that the information herein is true and accurate. *[signature]*     Nov/ 29. 2024     ☒ YES  ☐ NO

1  And it is further my belief that all relevant facts will
2  demonstrate a complicit showing of the attorney generals
3  office being aware of these unlawful acts. And in
4  this office is in violation of having unclean hands.

5

6  Where in case no: 5:18-cv-02488-AB-AGR plaintiff
7  HAROLD TAYLOR.
8  Did have a face to face conversation alleging that the
9  FIRM ATTORNEYS taking the case had been THREATENED
10 by the deputy Attorney General & this office where RYAN
11 GILLIS is employed as a Deputy A.G. made THREATS upon
12 this firm of Law to have the IRS bring Tax Evasion
13 charges, if they don't remove themselves from this case.
14 And when summary judgement is built on facts. These facts
15 and alot more evidence that mule creek state prison is
16 in violation of 4th Amendment to the U.S. Constitution.
17 Building Health Saf Code violation of the plumbing system.
18 Misappropriation of funds. Where a clear showing of
19 requested & allotted funding for projects pertaining to
20 fixing the subject for decades. Yet decades later the
21 water contamination in this prison mesp isn't fixed
22 as so other mentioned. The A.G. Office has this
23 information. And Discovery production of documents
24 will demonstrate they knew by being in possession
25 of these documents.

26

27 And if either party claims to not be in possession where civil
28 litigation would bring into play the funds accepted for this

1  matter.

2

3  And if it's alleged that requested evidence and illegally

4  documents are not in possession would be violation of

5  California Penal Code § 118

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CV-127 (09/09)          PLEADING PAGE FOR A SUBSEQUENT DOCUMENT

1    Xavier Lumar. Jweidl
2    4601 Hwy 104
3    P.O. 409090
     Ione California [near 95640]
4    T08643 ; £ 19.2o1
5    (Pro Se Litigant)

6              In the United States District Court
7              For the Eastern District of California
                      Sacramento Div.

8    Xavier Lumar Jweidl,
            plaintiff,                    Case No.: 2:21-cv-00712-WBS-DB
9
                                          Plaintiff's Motion Filed To Have
10                                        The California Attorney General
              vs.                         Recused / Removed From This Case
11
12   Joe Lizarraga, et al.
            defendant.
13

14

15       Plaintiff Xavier Lumar Jweidl, a pro se litigant has come before
16   This Court with this Motion To Have The California Attorney General
17   Recused / Removed From This Case.

18       And this requested motions for removal is based on the unclean
19   Hands of The Attorney General in this above case Number, due to
20   Knowledge and evidence of crimes, violations of California's Clean
21   Water Act, Misappropriation of Funds, Breach's Of Contract.

22       Where this information is within the possession of the Att. Gen,
23   that defendant's have and are still committing Inhumane acts
24   to plaintiff and the inmate population that will cause serious health
25   issues, and puts me at risk due to the hazardous chemicals within
26   the drinking water.

27

                                    1.

1  There is awareness by defendants, & the Att. Gen of this matter, and
2  with all the Fines, by the Regional Water Control Board, the numerous law
3  suits of this longed term violation.
4
5  Meeting's with the Court of Amador, the City of Ione, along with all of
6  the individuals that work for cdcr.
7
8  In 2011. 3.29 the settlement of $2.5 million
9  apart of that department that received money for clean up was
10  Environmental. And Gregor Larabee, was at all times aware of this &
11  present at meetings and is the CHIEF Environmental & Regulated Compliance.
12  GREGORY LARABEE, was stated to NOT HAVE A SUPERVISORY CONNECTION
13  inwhich was said for TERRI BETTENCOURT Regional Facilities Manager of
14  cdcr.  TANIR AHMED Associate Director of cdcr.
15  When these #3 individuals were at a meeting with the City of Ione
16  around the approx time of 2018 of April, discussing the contamination
17  that has came from Mule Creek State Prison.
18
19  Everyone that plaintiff had as a defendant did have AWARENESS and
20  KNOWLEDGE. THE SECRETARY in charge of overseeing ALL INSTITUTIONS of the
21  CALIFORNIA Prison SYSTEM and that is past and present Secretaries.
22
23  Kent Kralle of the California E.P.A. Compliance & Enforcement Officer, whom
24  made statements to the Dispatch Ledger News Paper about the
25  problem brought by plaintiff.
26
27

2.

1   And that is the same for Andrew Altevogt Assistant Executive Officer of
2   the Central Regional Water Quality Control Board, as well as Harold Holo
3   of the C.R.W.Q.C.B.  all spoke to there knowledgeable encounters with
4   this contamination of our drinking water and the water tables.
5   and wells contaminated do to the landscapes long contaminated
6   problems. And all have publicly spoke to the news paper, and
7   at a trial all these testimonies documents will show who
8   signed for money allotted that was spent on fixing the problem
9   then or now.
10   Yet the A.G. thraws Joe Lizarraga the warden out due to his
11   already criminal acts, but not Patrick Covello.
12
13   And the A.G. has documented evidence of this and more.
14   In which is why they should be removed because they are aware
15   of an ongoing criminal act being committed and are strongly
16   complaisant and the California Department of Corrections
17   CDCR is aware that the A.G. has and continuous to
18   allow this crime to continue.
19
20   And it is my belif that it represents a conflict. And until
21   the A.G. answers this complaint to prosecute cdcr or not.
22   And I reserve the right to add the A.G. as a defendant based on
23   the information of production of document and discovery.
24
25   Dated May 29  2024

3.